# IMPORTANT NOTICE
## NOT TO BE PUBLISHED OPINION

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED." PURSUANT TO THE RULES OF CIVIL PROCEDURE PROMULGATED BY THE SUPREME COURT, RAP 40(D), THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE CITED OR USED AS BINDING PRECEDENT IN ANY OTHER CASE IN ANY COURT OF THIS STATE; HOWEVER, UNPUBLISHED KENTUCKY APPELLATE DECISIONS, RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE BEFORE THE COURT. OPINIONS CITED FOR CONSIDERATION BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED DECISION IN THE FILED DOCUMENT AND A COPY OF THE ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE DOCUMENT TO THE COURT AND ALL PARTIES TO THE ACTION.

RENDERED: DECEMBER 14, 2023
NOT TO BE PUBLISHED

# Supreme Court of Kentucky

2022-SC-0288-MR

TYLER M. JORDAN                                               APPELLANT

|  |  |  |
|---|---|---|
| V. | ON APPEAL FROM LEWIS CIRCUIT COURT<br>HONORABLE BRIAN CHRISTOPHER MCCLOUD, JUDGE<br>NO. 20-CR-00014 | |

COMMONWEALTH OF KENTUCKY                              APPELLEE

## MEMORANDUM OPINION OF THE COURT

## <u>AFFIRMING</u>

A jury of the Lewis Circuit Court found Appellant Tyler M. Jordan ("Jordan") guilty of first-degree rape and first-degree sexual abuse of his fifteen-year-old step-niece Anna.[1] The jury recommended the maximum sentence of twenty years on the rape conviction and five years on the sexual abuse conviction, running consecutively for a total sentence of twenty-five years. The trial court sentenced in accordance with that recommendation. Jordan now appeals to this Court as a matter of right. Ky. Const. § 110(2)(b). After careful review, we affirm.

---

[1] "Anna" and the other names of minors in this Opinion are pseudonyms used to protect the privacy of the victim and other children.

## FACTUAL AND PROCEDURAL BACKGROUND

Jordan's brother Johnathan lived in a home with his wife Jessica, their three daughters, and Jessica's three daughters, Anna, Brittany, and Caroline from a previous relationship. Anna was the oldest of the six girls, all of whom shared a single bedroom furnished with bunk beds.

Jordan stayed in the home one or two nights a week, sleeping on a couch in the living room. In October 2019, when she was fifteen years old, Anna awoke in the middle of the night and went to the bathroom. As she tried to return to bed from the bathroom she encountered Jordan standing in a doorway blocking her. Anna tried to walk past Jordan but he pushed her back, twisted her around, and pushed her against a wall. He then placed his penis in her vagina for approximately five to six minutes until Johnathan emerged from his bedroom. At that point Jordan stopped, walked into the kitchen, and pretended to be looking for food in the refrigerator. Anna returned to bed.

On May 15, 2020, shortly before Anna's sixteenth birthday, Jordan entered her room while she was cornered, sleeping on the top bunk, and put his fingers in her vagina. Anna pretended to be asleep in the hopes that Jordan would leave her alone. A few days before this incident, Jordan had twice asked Anna if she would have sex with him.

On May 19, 2020, Jordan and Anna got into an argument over Jordan allegedly taking money from Anna's purse, ultimately resulting in Johnathan grounding Anna. The following day—the day before Anna's sixteenth birthday—Anna revealed to her family that Jordan had raped and sexually

2

abused her.  Johnathan called the police.  Law enforcement took Anna and her mother to the police department, conducted an investigatory interview, and arranged for a forensic interview at a child advocacy center.  Anna was not physically examined.

Law enforcement also spoke with Anna's sisters, Brittany and Caroline. Brittany told law enforcement that Jordan had previously cornered her in bed and asked her to watch pornography with him, and had also stood over her on a sofa and asked her to "suck his dick" a few days before the May 2020 incident with Anna.  Caroline told law enforcement that Jordan had once cornered her in the kitchen.

Police located and arrested Jordan approximately one week later.  Jordan denied Anna's allegations, claiming she invented them because she had been grounded shortly before her birthday due to their argument over missing money.  He was arrested and ultimately indicted on charges of incest, first-degree rape, and first-degree sexual assault.  The Commonwealth dismissed the incest charge before trial and proceeded on the remaining rape and sexual abuse charges.

At trial, Anna testified consistent with the charges against Jordan, and also regarding Jordan's two requests for sex a few days before the May 2020 incident.  Brittany and Caroline testified at trial that though they shared a room with Anna, they never saw or heard Jordan do anything sexual with her. However, Brittany also testified to the incidents in which Jordan asked her for oral sex and to watch pornography with him.  More particularly, Brittany

3

testified that Jordan approached her while she was laying in bed and asked her to watch pornography on a tablet, and that he approached her while she was sleeping on a couch in the living room and asked her for oral sex. Caroline testified regarding the incident in which Jordan attempted to control her in the kitchen, stating that Jordan had made her feel so nervous she punched him in the face. This testimony by Brittany and Caroline was admitted at trial pursuant to the trial court's pre-trial ruling denying Jordan's motion in limine to exclude it.

Johnathan testified at trial that Jordan was in jail during a portion of October 2019. Johnathan also testified that after Jordan's release he was not allowed to stay overnight in the home because he had hit his girlfriend in front of the girls, though he could come and eat at the home. Johnathan further testified he recalled seeing Jordan at his refrigerator in the middle of the night one night in October 2019.

Jordan also took the stand at trial. He testified on direct examination that he was in jail from September 22 to October 23, 2019, and thereafter could not stay overnight at Johnathan's home because he fought with his girlfriend in front of the girls. He further testified he was again in jail from December 22, 2019 to March 17, 2020 on domestic violence charges.

Jordan further testified he also did not stay the night at his brother's home in May 2020. According to Jordan, on May 20, 2020 he was at his brother's house and had an argument with Anna regarding moving her wallet. However he denied raping or sexually abusing Anna, asking Brittany for oral

4

sex, or cornering Caroline. He did acknowledge providing Brittany with a pornographic website in response to her questions about sex.

Jordan testified Anna and her sisters invented the rape and sexual abuse allegations because Anna was going to be grounded a week before her sixteenth birthday. Jordan also presented testimony by Johnathan highlighting a purported inconsistency insofar as Anna claimed the rape occurred in October 2019 after a playroom was added, while Johnathan testified he did not add the playroom until the summer of 2020. Jordan further presented testimony that the bunk bed on which Anna slept was too high for an adult male to reach into, though Anna testified the bunk bed was only as high as her shoulders and did not require a ladder for entry.

The trial court instructed the jury on one count each of first-degree rape and first-degree sexual abuse, with no lesser-included offense instructions. The jury found Jordan guilty of both charges. Following the penalty phase, during which Anna sat at the Commonwealth's counsel table, the jury recommended a total sentence of twenty-five years. The trial court imposed a sentence consistent with that recommendation.

## ANALYSIS

Jordan raises four issues for our review: (1) whether the trial court abused its discretion in admitting prior bad acts testimony by Brittany and Caroline; (2) whether the trial court erred in admitting Anna's testimony regarding Jordan's requests for sex given the lack of pre-trial KRE[2] 404(c)

---

[2] Kentucky Rule of Evidence.

notice; (3) whether prosecutorial misconduct violated his Due Process rights; and (4) whether his right to a fair trial was violated when the trial court allowed Anna to sit at the Commonwealth's counsel table during the penalty phase of the trial. We review each issue in turn, providing additional facts as necessary.

## I. The Trial Court Did Not Abuse Its Discretion In Admitting KRE 404(b) Evidence Of Jordan's Prior Bad Acts Against Brittany And Caroline.

Jordan first argues the trial court abused its discretion in admitting prior bad acts testimony by Brittany that Jordan asked her for oral sex and to watch pornography with him, and by Caroline that Jordan cornered her in the kitchen. Jordan's allegation of error is preserved by his motion in limine which the trial court denied by written order. KRE 103(d). The trial court concluded this testimony was admissible under KRE 404(b) given factual similarities between the charged conduct against Anna and the prior bad acts against Brittany and Caroline. We agree.

KRE 404(b) governs the admissibility of evidence of other crimes, wrongs, or acts. Under this Rule, such evidence is "not admissible to prove the character of a person in order to show action in conformity therewith." The purpose of the Rule is to avoid an unfair inference that a person's character as demonstrated by the commission of *other* bad acts indicates he likely also engaged in bad acts relevant to the case. As applied to criminal defendants, the Rule thus aims to avoid an unfair inference that the defendant is guilty of the charged offense because his character, as demonstrated by the commission of other bad acts, suggests he likely also committed the charged offense.

6

However, the Rule provides two exceptions in which evidence of other crimes, wrongs, or acts may be admissible. First, other bad acts evidence may be admissible if offered to prove something other than an impermissible inference on the basis of character, "such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." KRE 404(b)(1). Second, such evidence may also be admissible if it is "so inextricably intertwined with other evidence essential to the case that separation of the two (2) could not be accomplished without serious adverse effect on the offering party." KRE 404(b)(2). We review a trial court's decision to admit evidence under KRE 404(b) for abuse of discretion. *Anderson v. Commonwealth*, 231 S.W.3d 117, 119 (Ky. 2007). That is, we consider whether the trial court's ruling was "arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999).

In *Bell v. Commonwealth*, 875 S.W.2d 882 (Ky. 1994), we set forth the three factors that a trial court must consider in determining whether to admit evidence of other crimes, wrongs, or acts under KRE 404(b): relevance, probativeness, and prejudice. As to relevance, the trial court must consider whether the proffered evidence is relevant for some purpose other than to prove the defendant's criminal disposition. *Id.* at 889. As to probativeness, the trial court must consider whether there is sufficiently probative evidence the defendant committed the other crime, wrong, or act. *Id.* at 890. Finally, in considering prejudice, the trial court must determine whether the potential

prejudice from admission of the proffered evidence substantially outweighs its probative value. *Id.* In considering these factors, the trial court "must apply [KRE 404(b)] cautiously, with an eye towards eliminating evidence which is relevant only as proof of an accused's propensity to commit a certain type of crime." *Id.* at 889.

In the present case, we find no abuse of discretion in the trial court's determination that the allegations of Brittany and Caroline were relevant for a purpose other than merely proving Jordan's criminal disposition. In the context of child sex abuse cases, we have previously held that uncharged incidents of child sexual abuse may be admitted under KRE 404(b) for the purpose of proving a pattern of conduct. *Id.* To be admissible for this purpose, the method of the commission of the charged and uncharged acts must be "so similar and so unique as to indicate a reasonable probability that the crimes were committed by the same person." *Id.* (quoting *Adcock v. Commonwealth,* 702 S.W.2d 440, 443 (Ky. 1986)). Similarly, we have held that evidence of uncharged child sex abuse may be admissible in a child sex abuse case to prove, among other things, a motive of "sexual gratification" if the uncharged abuse is "so strikingly similar to the charged offense as to create a reasonable possibility that (1) the acts were committed by the same person, and/or (2) the acts were accompanied by the same *mens rea.*" *English,* 993 S.W.2d at 945.

A striking similarity of facts between the charged and uncharged offenses is thus often the touchstone for analysis of admissibility of uncharged child sex abuse under KRE 404(b) in child sexual abuse cases. *See Billings v.*

8

*Commonwealth*, 843 S.W.2d 890, 892 (Ky. 1992). The similarities must be so similar as to demonstrate modus operandi. *Id.* at 893. ("It is entirely appropriate, we believe, for purposes of assessing the admissibility of evidence of collateral crimes in the [child sex abuse] context . . . to require that the details of the charged and uncharged acts be sufficiently similar as to demonstrate a modus operandi."). Where the factual similarities rise to a level of modus operandi, admitting evidence of the uncharged child sexual abuse does not impermissibly ask the jury to infer that the defendant is guilty simply because he has previously engaged in other child sexual abuse; rather, it permissibly allows for an inference of guilt based instead upon the *striking factual similarity* between the charged and uncharged acts:

> [T]he probative value of modus operandi evidence [is not] derived solely from the presumption that the unproven accusation of crime must be true because the accused had committed the same crime before. If two or more victims allege strikingly similar facts, it tends to show the accused has a mode or method of operation. It refutes a contention that the victims are fabricating their complaints and tends to prove that the alleged crimes did, in fact, occur. This is distinct from an accused's propensity to commit a type of crime. It is only when the acts are dissimilar that use of the evidence tends solely to prove an accused's criminal disposition.

*Newcomb v. Commonwealth*, 410 S.W.3d 63, 74 n.13 (Ky. 2013) (citations omitted).

Determining whether charged and uncharged child sex abuse allegations bear such striking factual similarities as to demonstrate modus operandi and thus be admissible under KRE 404(b) is "a difficult, fact-specific inquiry" that requires the trial court to "engage in a searching analysis of the similarities and

9

dissimilarities" between the charged and uncharged conduct. *Clark v. Commonwealth*, 223 S.W.3d 90, 96-97 (Ky. 2007). As our jurisprudence in this area has developed we have considered a number of factual circumstances to determine whether the requisite similarity is present, including:

1) The nature of the sex acts themselves;

2) The number of sex acts;

3) The relationship between the defendant and the victims;

4) Any positions of trust held by the defendant vis-à-vis the victims;

5) The ages of the victims;

6) The methods used by the defendant to engage in the abuse, including methods to groom, isolate, or seclude the victims, or otherwise prepare for the abuse;

7) Particular language used by the defendant during the abuse;

8) Threats of retaliation for disclosure;

9) The length of time the abuse occurred;

10) Whether the acts occurred within the same timeframe;

11) The location of the abuse;

12) Whether the abuse occurred when the defendant was alone with the victim or when other people were around; and

13) Whether the defendant sought reciprocal sexual contact from the victims.

*See Bell*, 875 S.W.2d at 889-90 (nature of the sex acts, number of acts, methods used, language used, threats, length of time, timeframe, and location); *Lear v. Commonwealth*, 884 S.W.2d 657, 659-60 (Ky. 1994) (nature of acts, relationship, victim age, threats, length of time, and location); *Clark*, 223

10

S.W.3d at 98 (nature of acts, position of trust, victim age, others absent or nearby, and requests for reciprocation). Of course there may also be other factual circumstances relevant to the trial court's determination, given the intensely fact-specific nature of the similarity inquiry.

While the factual similarities must be sufficiently striking to demonstrate modus operandi, the uncharged act need not be identical to the charged offense to be admissible under KRE 404(b). *Clark*, 223 S.W.3d at 97. The fundamental inquiry is simply whether, in considering the totality of the circumstances, there are sufficiently striking factual similarities between the charged and uncharged conduct that the jury would not be asked to infer the defendant's guilt simply from the uncharged allegations, but rather to reasonably infer *from the striking factual similarities* between the charged and uncharged conduct that the defendant engaged in the charged offense.

In the present case, Jordan's uncharged acts against Brittany and Caroline bore sufficiently striking factual similarities to his charged rape and sexual abuse of Anna as to demonstrate modus operandi. A review of the circumstances surrounding each incident show Jordan had a particular way and method of cornering his step-nieces to initiate sexual contact. First, Anna, Brittany, and Caroline all bore the same relationship with Jordan as they were all his step-nieces, unlike the other girls in the home who were Jordan's blood relatives. Second, all three girls were of similar adolescent ages at the time of the abuse, between twelve and fifteen years of age. Third, all of the incidents

11

occurred at the victims' home, and all apparently when no one else was around.

Finally, and perhaps most importantly, Jordan also repeatedly employed a method in perpetrating his abuse so unique as to rise to the level of a signature crime. In each instance of abuse, Jordan physically cornered or approached his victims while they were vulnerable and isolated, almost invariably while they were in a state of sleep, near-sleep, or repose. With respect to the charged allegations, Jordan approached Anna while she was sleeping in her bed, where he then sexually abused her. Similarly, he approached and raped Anna in the middle of the night as she returned to her bed from the bathroom. With respect to the uncharged conduct, Jordan approached Brittany as she lay in bed to ask her to watch pornography with him. He approached her as she lay sleeping on the couch to ask her to perform oral sex. As for Caroline, Jordan cornered her in the kitchen so aggressively that she found it necessary to punch him in the face to escape. Jordan's repetitive use of a technique of physically cornering his victims, usually while they were sleeping or resting, was sufficiently unique that evidence of the uncharged conduct did not impermissibly invite the jury to simply infer a criminal disposition, but rather to permissibly infer from these striking factual similarities that the victims were not fabricating their allegations.

Admittedly, there was also some dissimilarity between the charged and uncharged conduct insofar as Anna alleged rape and digital penetration, Brittany alleged only requests to view pornography and for oral sex, and

12

Caroline alleged no sexual contact but only that she was aggressively cornered in the kitchen. However, the mere fact that the nature of the sex acts themselves may differ from victim to victim does not render uncharged abuse inadmissible where there are other striking factual similarities. *See, e.g., Leach v. Commonwealth*, 571 S.W.3d 550, 556 (Ky. 2019) (uncharged allegation of kissing and touching of breasts of minor admissible in case involving charge of sexual touching, digital penetration, and oral sex with minor, given striking similarity in defendant's method of secluding victims); *Anastasi v. Commonwealth*, 754 S.W.2d 860, 861 (Ky. 1988) (uncharged child rape admissible in child sexual touching case, given striking factual similarity in defendant's method of perpetrating abuse). Nor in good conscience could we countenance exclusion of this highly relevant evidence simply given slight differences in Jordan's sexual tastes from girl to girl or the fortuity of some of his victims rejecting or escaping his advances. In sum, given the significant similarities between the charged and uncharged conduct, and in particular the strikingly unique method employed by Jordan to perpetrate his abuse against all three victims, we find no abuse of discretion in the trial court's conclusion the uncharged conduct was relevant for permissible purposes, including motive, under KRE 404(b).

The next factor of the *Bell* inquiry is probativeness, requiring us to consider whether the trial court abused its discretion in finding a jury could reasonably conclude the uncharged conduct occurred and was committed by Jordan. *See Leach*, 571 S.W.3d at 554. We perceive no such abuse of

13

discretion.  Both Brittany and Caroline made their allegations to law enforcement during the course of the police investigation.  Moreover, the allegations were consistent with the time frame and nature of Anna's allegations.  Given the willingness of the victims to make the statements to law enforcement and the consistencies between the allegations, the trial court did not abuse its discretion in concluding a jury could believe Jordan engaged in the uncharged conduct.

Finally, we find no abuse of discretion in the trial court's conclusion that admission of the uncharged acts was not overly prejudicial.  "Only if the potential for undue prejudice substantially outweighs the probative value of the evidence must it be excluded." *Id.* at 554.  "Prejudice means that evidence produces an emotional response that inflames the passions of the triers of fact or is used for an improper purpose." *Id.* (citation omitted).

Plainly, the allegations by Brittany and Caroline were prejudicial to Jordan, as they involved claims he presented pornography, solicited sexual favors, and aggressively cornered a twelve-year-old girl. *Bell*, 875 S.W.2d at 890 ("[T]here exists universal agreement that evidence [of other bad acts] is inherently and highly prejudicial to a defendant.").  However, KRE 403 makes clear that for evidence to be excluded on grounds of prejudice, "the probative value must be *substantially* outweighed by the prejudicial effect." *Leach*, 571 S.W.3d at 557.  Given the striking factual similarities with Anna's claims, the allegations by Brittany and Caroline were highly probative of the ultimate issue in the case—Jordan's guilt.  Their testimony was also limited in duration.

14

Thus, that testimony was relevant for a permissible purpose under KRE 404(b), probative, and because its prejudicial impact did not substantially outweigh its probative value, the trial court did not abuse its discretion in admitting it.

## II. Error, If Any, In Admitting Evidence Jordan Twice Propositioned Anna For Sex Was Harmless.

Jordan next argues the trial court erred in admitting Anna's testimony that he twice asked her for sex a few days before the May 2020 incident. More particularly, Jordan asserts the evidence should not have been admitted because it was prior bad acts evidence for which the Commonwealth did not provide pre-trial notice pursuant to KRE 404(c). Jordan's allegation of error was preserved by his contemporaneous objection. KRE 103(a)(1). The trial court overruled that objection, concluding the evidence was not within the scope of KRE 404. We thus review to determine whether any resulting error was harmless. *See Clark v. Commonwealth*, 267 S.W.3d 668, 681 (Ky. 2008) (finding only harmless error where trial court admitted prior bad acts evidence for which the prosecution had not provided pre-trial KRE 404(c) notice).

KRE 404(c) requires that if the prosecution intends to admit KRE 404(b) evidence as part of its case in chief, "it shall give reasonable pretrial notice to the defendant of its intention to offer such evidence." If the prosecution fails to do so, the trial court may either exclude the evidence or "for good cause shown may excuse the failure to give such notice and grant the defendant a continuance or such other remedy as is necessary to avoid unfair prejudice caused by such failure." KRE 404(c).

As an initial matter, we question whether Jordan's propositioning of Anna for sex a few days before he sexually abused her constitutes a separate "other" bad act to which KRE 404(b) would apply. For notice to be required under KRE 404(c), the evidence the prosecution seeks to offer must relate to some *other* crime, wrong, or act. KRE 404(b) has no bearing on admission of evidence of the charged crime itself. Here, Jordan's propositioning of Anna was sexual in nature and occurred in close temporal proximity to the charged offense of sexual abuse. It could thus reasonably be argued that the propositions were simply part of the overall narrative regarding the sexual abuse.

Even were we to conclude that the testimony involved a prior bad act within the scope of KRE 404(b) however, its admission would at most constitute harmless error. Jordan's unsuccessful propositioning of Anna can be viewed as a description of the circumstances leading to Jordan's actions and pales in comparison to the seriousness of the charged offenses of rape and sexual abuse. As such, that evidence was unlikely to have had any effect on the jury's determination of guilt for the far more serious charged offenses. In addition, the questioning regarding the propositions was fleeting. As such, we can say with fair assurance that Anna's testimony regarding the propositions did not sway the verdicts. Any error in the admission of that testimony would have been at most harmless. *See Winstead v. Commonwealth*, 283 S.W.3d 678, 688-89 (Ky. 2009) ("A non-constitutional evidentiary error may be deemed

16

harmless . . . if the reviewing court can say with fair assurance that the judgment was not substantially swayed by the error.").

### III.    There Was No Prosecutorial Misconduct Warranting Reversal.

Jordan next argues reversal is warranted due to a number of alleged instances of prosecutorial misconduct.  Jordan acknowledges that while some of these alleged errors are preserved for our review, others are not.  He thus requests palpable error review of the unpreserved errors.

Where alleged prosecutorial misconduct errors are preserved by objection, we reverse "if proof of the defendant's guilt was not such as to render the misconduct harmless, and if the trial court failed to cure the misconduct with a sufficient admonition to the jury." *Duncan v. Commonwealth*, 322 S.W.3d 81, 87 (Ky. 2010).  For unpreserved allegations of prosecutorial misconduct error, we reverse only if the conduct was both flagrant and palpable error resulting in manifest injustice.  RCr[3] 10.26; *Matheney v. Commonwealth*, 191 S.W.3d 599, 606 & 607 n.4 (Ky. 2006).  To determine if the misconduct is flagrant, we consider "(1) whether the remarks tended to mislead the jury or to prejudice the accused; (2) whether they were isolated or extensive; (3) whether they were deliberately or accidentally placed before the jury; and (4) the strength of the evidence against the accused." *Mayo v. Commonwealth*, 322 S.W.3d 41, 56 (Ky. 2010) (quoting *Hannah v. Commonwealth*, 306 S.W.3d 509, 518 (Ky. 2010)).

---

[3] Kentucky Rule of Criminal Procedure.

## A. The Prosecutor Did Not Impermissibly Badger Jordan.

Jordan first alleges that the prosecutor improperly badgered him in the following exchange by repeatedly asking him why he asked Brittany for oral sex, even after Jordan denied doing so:

**Com.**: So is the fact that you share no blood relation with [Brittany], is that what made you think it was okay to ask her to "suck your dick?"

**Jordan**: Never did I.

**Com.**: Oh, you didn't?

**Jordan**: Never did I.

**Com.**: But you did show [Brittany] pornography, is that what you just testified to?

**Jordan**: No, Sir. What I said was that, I didn't even get to that part, what happened was that in my, I shouldn't have done it, but what I said was, honey, she asked me a question about sex, and I didn't feel comfortable at that point after asking her if they were using protection, I didn't feel comfortable at that point, so what I did was I did give her a site to go to, that I did do, and I gave her the tablet but it was not on there, if she typed it in, I couldn't tell you. But I did give her a porn site, yes, I did.

**Com.**: You gave a thirteen-year-old child a porn website?

**Jordan**: Yes, I did.

**Com.**: Why? What would possess you to give a thirteen-year-old child a pornographic website?

**Jordan**: I didn't feel comfortable in giving her answers to the questions she was asking me so. . .

**Com.**: You gave a child pornography as some sort of educational tool?

**Jordan**: It is bad, yes, yes.

**Com.**: And what about when you asked the thirteen-year-old to "suck your dick," was that for some kind of educational purpose?

18

**Jordan**: I did not do that. I did not do that, Sir. I did not do that.

**Com.**: So, it wasn't for an educational purpose, it was for your pleasure?

**Jordan**: Sir, I did not do that. I did not do that.

Jordan contends the prosecutor's questions were designed to make him look argumentative, and that the trial court failed to control the examination as required under KRE 611(a)(3) to "protect [him] from harassment." Jordan objected at trial to this examination and his allegation of error is therefore preserved.

Jordan is correct that the prosecutor asked him four separate times about propositioning Brittany for oral sex. Yet when considering the broader context of the cross-examination, each inquiry was fair. The first time of course was fair because the question had not yet been asked. The second time was merely a confirmation of Jordan's answer to the first inquiry. The prosecutor posed the third question after Jordan himself pointed to the allegedly educational purpose of providing Brittany with a pornographic website, to ask whether that was also the purpose of the request for oral sex. The final time, the prosecutor responded to Jordan's denial by asking whether the purpose of the request was pleasure.

Cross-examination is an adversarial process designed to reveal the truth through vigorous, robust, and challenging inquiry. In the course of cross-examination, an attorney is not bound to simply accept a witness's first denial of an accusation, never again to return to the subject. For

19

example, an attorney may properly challenge a denial by pointing to other facts or inconsistencies. An attorney may pose additional questions designed to highlight the denial's lack of credibility. Or an attorney may, within reasonable limits, return to the subject of the denial should further development of the testimony otherwise warrant it.

Of course, counsel should not so needlessly belabor an inquiry as to cross the line from vigorous advocacy to improper harassment and badgering. This however was not such a case. The prosecutor's four short inquires—one of which was merely confirmation of a previous answer—were appropriately posed within the context of the testimony as it developed. We perceive no misconduct in the prosecutor's cross-examination.

### B. The Prosecutor's Cross-Examination Of Jordan Regarding His History Of Domestic Violence Was Proper.

Jordan also alleges the prosecutor engaged in misconduct by making the following use of Jordan's criminal record on cross-examination:

**Com.**: Your testimony is you were released on October 23 of 2019, correct?

**Jordan**: Yes.

**Com.**: Okay. So you were out of custody in October of 2019, weren't you?

**Jordan**: On the 23rd of that month, yes.

**Com.**: Okay. It says here you were in there for assault, domestic violence?

**Jordan**: Yes.

20

**Com**.:  Alright.  And I heard you testify that you were incarcerated again a couple of months later in December is that right?

**Jordan**:  Yes.  Yes, from December 22 to March 17 of 2020.

**Com**.:  I'm looking at this, that was for assault domestic violence again?

**Jordan**:  Yes, Sir.

**Com.**:  Third or more offense in five years?

**Jordan**:  Yes.

**Com**.:  You've got a real problem with violence towards women don't you?

**Jordan**:  No, Sir.

**Com.**:  Does it make you sexually excited to hurt women?

**Jordan**:  No, Sir.

**Com**.:  So you just don't have respect for women as people then, that's it?

**Jordan**:  How can you ask me that?

**Com**.: No more questions for this Defendant.

**Jordan**:  You do understand that domestic violence can be considered an argument too?

**Com**.: No other questions for this Defendant.

**Court**: Mr. Jordan, hush.

The prosecutor referred to a paper copy of Jordan's criminal record during the questioning and Jordan objected on grounds that the document was not entered into evidence.[4]  However Jordan did not object on grounds of

---

[4] Given that Jordan himself raised his criminal history of domestic violence during his direct examination, we find no reversible error in the prosecutor's reference to the unadmitted criminal record while cross-examining Jordan.

prosecutorial misconduct and we therefore consider only whether the alleged misconduct was flagrant and constituted palpable error. *Matheney*, 191 S.W.3d at 606 & 607 n.4.

We do not find the cross-examination improper. Notably, Jordan himself inserted the issue of his domestic violence criminal history into the trial by pointing to that history, resulting time in jail, and resulting prohibition on sleeping at Johnathan's home as reasons he could not have engaged in the conduct alleged by Anna. Once Jordan raised this alibi on direct examination, it was fair for the prosecutor to challenge the alibi by highlighting that Jordan's domestic physical violence history could be equally consistent with *guilt* for the charged offenses involving sexual violence.

It is widely recognized that physical domestic violence is frequently motivated by the perpetrator's desire for power and control over the victim:

> Although social scientists caution that there is no singular profile of a domestic abuser's psychology, they commonly use a framework of power and control to explain the coercive nature of domestic violence, emphasizing that the intended harm goes beyond physical injury. Empirical evidence supports the theory that domestic violence is often driven by a desire to control. . . . [D]omestic violence is about gaining control over another person[.]

Alafair S. Burke, *Domestic Violence as a Crime of Pattern and Intent: An Alternative Reconceptualiziation*, 75 Geo. Wash. L. Rev. 552, 569 (2007). Sexual violence likewise is often motivated by the perpetrator's desire to exercise power and control over the victim. *See, e.g., id.* at 571 (noting that perpetrators engage in both physical and sexual violence "for the purpose of obtaining and maintaining power and control"); *State v. Thompson*, 504 N.W.2d

315, 319 (N.D. 1993) ("The crime of rape has at its core the exercise of power and control over the victim. 'Rape, then, is a pseudosexual act, a pattern of sexual behavior that is concerned much more with status, hostility, control, and dominance than with sensual pleasure or sexual satisfaction.'") (quoting A. Nicholas Groth & H. Jean Birnbaum, *Men Who Rape: The Psychology of the Offender* at 13 (Plenum 1979)). As such, once Jordan pointed to his history of domestic violence as a reason he was *not* guilty, it was not unreasonable for the prosecutor to ask whether Jordan's domestic violence could also be equally consistent *with* guilt, given that both physical domestic violence and sexual violence often involve a perpetrator's efforts to exercise power and control over his victim. We perceive no misconduct in the prosecutor's pursuit of that line of inquiry.

### C. The Prosecutor's Reference To Opposing Counsel's Inability To Find Inconsistencies In Anna's Story Was Not Misconduct.

Jordan next alleges prosecutorial misconduct occurred when the prosecutor stated in closing argument that despite flipping through numerous binders during the course of the trial, defense counsel had been unable to identify any inconsistencies in Anna's testimony. Jordan contends this improperly asserted a lack of inconsistency when in fact Anna's testimony was not consistent, and also improperly suggested the defense bore the burden of proving Jordan was innocent. This allegation of error was not preserved and thus we consider only whether the alleged misconduct was flagrant and constituted palpable error.

23

It is axiomatic that "[p]rosecutors are allowed great latitude in opening statements and closing arguments, which are not evidence." *Newcomb*, 410 S.W.3d at 88. Here, the trial court informed the jury before closing statements that the evidence had closed, and both the court and the prosecutor informed the jury that counsel's statements were not evidence. The prosecutor's assertion that the defense failed to identify inconsistencies in Anna's story was well within the bounds of the "great latitude" afforded to a prosecutor's commentary on the evidence in a closing statement. *See Slaughter v. Commonwealth*, 744 S.W.2d 407, 412 (Ky. 1987) ("A prosecutor may comment on tactics, may comment on evidence, and may comment as to the falsity of a defense position."). That he included a fanciful reference to defense counsel flipping through binders does not rise to the level of flagrant misconduct. Finally, we also do not perceive in the prosecutor's statement any suggestion that Jordan bore the burden of proof. In any event, defense counsel stated in its closing argument that the Commonwealth failed to meet *its* burden of proving guilt beyond a reasonable doubt. As such, we find no prosecutorial misconduct, much less palpable error, in that statement.

### D. The Prosecutor's Commentary On The Length Of Jordan's Sentence Was Not Improper.

For his next allegation of prosecutorial misconduct error, Jordan points to the prosecutor's penalty phase opening and closing statements that a five-year sentence might actually only be two years, or a twenty-five year sentence only twenty years. Jordan contends these statements improperly suggested that parole eligibility and credits could make Jordan's maximum sentence five

24

or twenty years, rather than merely eligible for parole at that time. Again, because this allegation of error is unpreserved, we consider in our review whether the statement was flagrant and resulted in palpable error.

We disagree with Jordan's contention that the prosecutor's statements could reasonably be understood as suggesting Jordan's maximum sentence might be twenty years if he was sentenced to twenty-five years, not merely that he might be eligible for parole in twenty years. The testifying parole and probation officer was asked about and discussed the options available to the parole board during review, including deciding that the defendant should serve out the full remainder of the sentence. The officer also testified he has no way of knowing what decision the parole board will reach. This testimony made clear that while parole *might* result in the defendant being released from prison sooner than the full term of his sentence, there is no guarantee of such a release. Jordan's cross-examination likewise made clear credits are not guaranteed, as he elicited testimony Jordan would not be entitled to good time credit and could not be eligible for any credit until he completed the sex offender treatment program. As such, we see no room for confusion by the jury that Jordan would surely serve less than the recommended sentence because of credits and even if he was not granted parole.[5]

---

[5] Jordan's allegation that error occurred when the Commonwealth failed to elicit further detail from the parole and probation officer regarding parole eligibility and credits also fails because Jordan himself of course could have elicited such testimony or offered another witness to provide it. *See Lear*, 884 S.W.2d at 661 ("During cross-examination of the witness, the defense objected to the previous testimony when the witness was unable to provide information regarding the chances of a prisoner being released on parole. [Defendant] did nothing to attempt to introduce such evidence

25

**E. The Prosecutor's Questions Asking Jordan To Say Whether The Victims Were Lying Was Improper But Not Flagrant.**

Jordan next alleges prosecutorial misconduct because the prosecutor asked him whether Anna, Brittany, and Caroline were lying and why they were lying. Jordan did not object to this line of questioning at trial and the error is thus unpreserved. We therefore again consider only whether the alleged misconduct was flagrant and constituted palpable error.

Unquestionably, the prosecutor's questions asking Jordan to characterize the victims as liars were improper. We have long held that a witness should not be asked such questions:

> A witness should not be required to characterize the testimony of another witness . . . as lying. Such a characterization places the witness in such an unflattering light as to potentially undermine his entire testimony. Counsel should be sufficiently articulate to show the jury where the testimony of the witnesses differ without resort to blunt force. . . . "A witness's opinion about the truth of the testimony of another witness is not permitted. Neither expert nor lay witnesses may testify that another witness or a defendant is lying or faking. That determination is within the exclusive province of the jury."

*Moss v. Commonwealth*, 949 S.W.2d 579, 583 (Ky. 1997) (quoting *State v. James*, 557 A.2d 471, 473 (R.I. 1989)). As such, the prosecutor erred in asking Jordan whether the victims were lying.

However, we do not find the misconduct to be flagrant as required to warrant reversal on this unpreserved error. On the one hand, the misconduct

himself. Now he complains that because a witness did not provide the testimony he desired, it was somehow error to allow testimony which potentially hurt him. He is unable to provide any citation to authority to support such a theory. Thus we conclude that there was no reversible error.").

did not tend to mislead the jury because Jordan himself insinuated that Anna's allegations were false before he was ever asked if she was lying. The line of questions regarding lying did not occur until immediately after the following exchange:

> **Com.**: Sir, you sat right there yesterday when [Anna] testified, didn't you?
>
> **Jordan**: Yes.
>
> **Com.**: Okay. You saw her eyes well up with tears?
>
> **Jordan**: Yes.
>
> **Com.**: Okay. You saw her turn away, right, during her testimony at points?
>
> **Jordan**: Yes.
>
> **Com.**: Right. You watched that child relive the trauma of you raping her?
>
> **Jordan**: I don't know what she thinks happened, Sir, but it did not happen.

Jordan's denial of the veracity of Anna's allegations was thus already before the jury before he was ever asked if the victims were lying. In addition, while the prosecutor asked Jordan eight separate times whether the victims were lying, all the questions occurred with a short span of time and thus were isolated.

On the other hand, the prosecutor's questioning was deliberate given that he repeatedly and purposefully asked Jordan whether the victims were lying. Also supporting a finding that the conduct was flagrant is the weakness of the evidence against Jordan. There was no physical evidence, and thus the case came down to the credibility of Anna's allegations and Jordan's denials.

27

Where, as here, our factors for considering whether prosecutorial misconduct is flagrant are evenly divided, we consider "the trial as a whole to determine if the improper comments undermined the essential fairness" of the trial. *Mayo*, 322 S.W.3d at 57. Here, we do not find the prosecutor's line of questioning so egregious as to have so undermined the fairness of Jordan's trial, given its brevity and Jordan's evident denial of the victims' veracity in any event. Nonetheless, we strongly caution prosecutors—and indeed all attorneys—in the Commonwealth against pursuing lines of questioning designed to elicit testimony that another witness is lying.

Separately, we find no merit in Jordan's suggestion that the prosecutor engaged in misconduct during this same line of cross-examination by stating Jordan's theory of the case did not make sense. Jordan's theory was that Anna invented the rape and sexual abuse allegations because she was grounded before her birthday over an argument she had with Jordan regarding money. The prosecutor's pressing of Jordan on cross-examination as to whether that theory made sense was a fair tactic to challenge the credibility of the theory. Finally, we also find no merit in Jordan's argument that during the same line of questioning, the prosecutor engaged in misconduct by referring to the victims as "little girls." The prosecutor's characterization was fair given that the victims were between the ages of twelve and fifteen at the time of the abuse.

**F. The Prosecutor's "Send A Message" Closing Argument Was Improper But Not Flagrant.**

Finally, Jordan contends prosecutorial misconduct occurred when the prosecutor used a "reverse send a message" argument in the following portion of his closing statement:

> Guys, [Anna's] going to turn eighteen in a couple of months. She's going to graduate high school a couple weeks after that. She's going to go out into the world, and her interactions are going to form her basis for what kind of world she thinks this is. When you guys go back there and you reach a decision no matter what that verdict is, you're going to send [Anna] a message. If you decide to acquit, the message you're going to send is going to confirm all her worst fears, that we don't believe kids. It doesn't matter how compelling the testimony is, it's not good enough, we just don't believe it. Right? You can send her that message. You can go back there and you can convict, and you can let [Anna] know that there is justice in this world. You can let [Anna] known that there's justice for her. [Anna] deserves justice. And Tyler Jordan deserves to go to prison for what he did to her. Thank you, guys.

Jordan did not object at trial, and we therefore review this unpreserved issue to consider whether the misconduct is flagrant and constitutes palpable error.

We agree with Jordan that this constituted prosecutorial misconduct. As with his questions as to whether the victims were lying, the prosecutor's request that the jury send a message to Anna that she was believed and that justice would be served contravened our well-established direction to avoid employing "send a message" arguments. *See, e.g., Brewer v. Commonwealth*, 206 S.W.3d 343, 351 (Ky. 2006) ("[W]e do find that the Commonwealth's exhortation to this jury to 'send a message' to the community was improper. We strongly urge the prosecutors throughout the Commonwealth to use extreme caution in making similar arguments."); *Golden v. Commonwealth*, No.

29

2016-SC-000179-MR, 2017 WL 1536253, at *7 (Ky. Apr. 27, 2017) ("Urging the jury to fix a sentence that pleases the victim, vindicates her accusations, or satisfies her perceived plea for justice, is very much akin to the impermissible arguments for sending similar messages to the community at large. . . . This type of argument remains prohibited . . . .").

Unfortunately defense counsel did not object to the statement, and thus the trial court was not afforded an opportunity to admonish the jury to disregard it. However, because we do not find the statement flagrant, it does not warrant reversal.

Weighing in favor of not finding the misconduct flagrant, the prosecutor's statement did not mislead the jury. Nor did it prejudice Jordan, as it merely reiterated the widely known fact that a victim at trial wishes to be believed and to see justice done. The request was also isolated. On the other hand, it was also a deliberate statement and the evidence against Jordan was not overwhelmingly strong, weighing in favor of a conclusion that the misconduct was flagrant. Ultimately, while the factors thus weigh evenly for and against finding the conduct flagrant, in considering the trial as a whole we do not find that the statement undermined the essential fairness of the trial. That said, and again, we nonetheless caution the prosecutors of the Commonwealth that neither seeking testimony that other witnesses are lying nor using "send a message" arguments in closing statements are appropriate trial conduct. However, in sum and in considering the alleged instances of misconduct both individually and taken together as a whole, we do not find reversal warranted.

30

### IV. The Trial Court Did Not Err In Allowing Anna To Sit At The Commonwealth's Counsel Table During The Penalty Phase.

For his final allegation of error, Jordan contends the trial court violated KRE 615 by allowing Anna to sit at the Commonwealth's counsel table during the penalty phase. We disagree.

KRE 615 addresses the exclusion of witnesses from the courtroom, not whether a victim may sit at counsel table. KRE 615 (allowing trial courts to "order witnesses excluded so that they cannot hear the testimony of other witnesses."). Anna was not a witness during the penalty phase. As such, KRE 615 had no bearing on her ability to sit at counsel table. Allowing Anna to sit at counsel table also did not infringe on Jordan's right to a presumption of innocence, which was extinguished by the jury's verdicts against him in the guilt phase. *See Long v. Hamilton*, 467 S.W.2d 139, 141 (Ky. 1971) ("A defendant in a criminal action is presumed innocent of any charge *until convicted*." (emphasis added)). Nor do we otherwise see how Anna sitting at counsel table during the penalty phase resulted in prejudice to Jordan. As such, reversal on this ground also is not warranted.

### CONCLUSION

For the foregoing reasons, we affirm the judgment of the Lewis Circuit Court.

VanMeter, C.J.; Bisig, Keller, Lambert, Nickell, Thompson, JJ., sitting. VanMeter, C.J.; Bisig, Keller, Lambert, JJ., concur. Thompson, J., concurs in result only. Nickell, J., dissents by separate opinion. Conley, J., not sitting.

31

**NICKELL, J., DISSENTING:** I respectfully dissent. The uncharged misconduct evidence involving the victim's siblings should have been excluded because it was insufficiently similar to the charged offenses. By magnifying the import of the similarities and abstracting the significance of the differences between the charged offenses and uncharged misconduct, the majority eschews the exacting standard of "striking similarity" required by our precedents. Thus, the majority inverts the exclusionary purpose of KRE 404(b) to reflexively admit the type of improper propensity evidence the rule was designed to exclude. In my view, this judicial expansion of a uniform rule marks an unwarranted return to the "scattershot" approach of our pre-Rules jurisprudence. *See Billings v. Commonwealth*, 843 S.W.2d 890, 893 (Ky. 1992).

Because the improper use of uncharged sexual misconduct is extremely prejudicial, we have consistently required the Commonwealth, as the proponent of the evidence, to shoulder "a heavy burden" to establish a modus operandi. *Clark v. Commonwealth*, 223 S.W.3d 90, 97 (Ky. 2007). "Ultimately, the Commonwealth must demonstrate that there is a factual commonality between the prior bad act and the charged conduct that is simultaneously similar and so peculiar or distinct that there is a reasonable probability that the two crimes were committed by the same individual." *Commonwealth v. Buford*, 197 S.W.3d 66, 71 (Ky. 2006). The degree of similarity must evince a "signature crime" and requires proof of

> acts that mark the crime as that of a specific person who may be
> unknown until caught, but who is identified by the distinctive
> nature of his or her acts. Examples include well-known criminals

32

such as Jack the Ripper; the BTK (bind, torture, kill) strangler; and the Unabomber. By their distinct criminal methods, each of them signed off on their crimes.

*Woodlee v. Commonwealth*, 306 S.W.3d 461, 465 (Ky. 2010). "While modus operandi may not require commonalities as blatant as those listed above," these examples illustrate the meaning of "striking similarity." *Id.*

While the majority correctly notes the charged and uncharged sex acts need not be precisely identical, "[t]he lack of a consistent allegation . . . greatly undercuts the purported distinct pattern to [a defendant's] abuse." *Clark,* 223 S.W.3d at 98. In the present appeal, the charged offenses involved a forcible rape and sexual abuse involving digital penetration while the uncharged acts consisted of: a rebuffed request for oral sex; a rebuffed request to watch pornography; and menacing without physical contact. As in *Clark,* these inconsistencies should weigh heavily against a purported signature crime.

I agree with the majority that the similarities between the victims' ages and their relationship to Jordan are relevant to a finding of modus operandi. However, in my view, the degree of similarity required by our precedents ceases at this level. The fact that the charged and uncharged misconduct occurred in the victims' house is not particularly distinctive in comparison to *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999), where "[e]ach incident occurred . . . *presumably in a living room area as opposed to, e.g., a bedroom.*" *Id.* (emphasis added). In the present appeal, the charged offenses occurred in a hallway and a bedroom. The uncharged conduct occurred in a bedroom, in the living room, and in the kitchen.

33

The majority further ascribes a unique "method" to Jordan's manner of approaching and cornering each of the victims "while they were vulnerable and isolated, almost invariably while they were in a state of sleep, near-sleep, or repose." *Ante*, at 12. However, the act of a sexual predator in approaching a vulnerable and isolated victim is not necessarily peculiar or unique. *See Woodlee*, 306 S.W.3d at 465 ("It is not peculiar or distinct that Appellant was alone with both victims when he allegedly abused them. . . . Virtually all sexual offenses occur when the perpetrator and victim are alone."). Moreover, the majority's characterization of Jordan's purported method cannot withstand the "searching analysis" and "difficult, fact-specific inquiry" demanded by our precedents. *Clark*, 223 S.W.3d at 96-97.

Our recent decision in *Leach v. Commonwealth*, 571 S.W.3d 550, 555 (Ky. 2019), is instructive. The defendant in *Leach* was charged with sodomizing and sexually abusing his step-niece over a period of three years. *Id.* at 553. The trial court permitted the Commonwealth to introduce evidence that the defendant also sexually abused his second-cousin by marriage. *Id.* at 555. After recounting the similarities between the victims as well as the factual differences in the various acts of abuse, we concluded the "[m]ost striking" similarity was

> the way in which [the defendant] secluded each of the girls in order
> to perpetrate his abuse. In both cases, he devised a game to play
> in the woods behind his house, using a motor vehicle, to get the
> girls alone.

34

*Id.* at 556.  The use of a game to perpetrate the abuse of both girls thus constituted the distinctive pattern justifying the admission of the uncharged acts of abuse.  *Id.*

By contrast, in the present appeal, Jordan did not approach or isolate the victims in such a specific and distinctive manner.  The charged offense of rape occurred in the middle of the night when Anna woke up to use the bathroom.  Jordan did not speak and immediately forced himself upon her.  The charged offense of first-degree sexual abuse also occurred in the middle of night while Anna was sleeping in bed.  Again, Jordan did not speak and immediately forced the sexual contact.

The uncharged act involving pornography occurred while Brittany was in the shared bedroom.  After Jordan came into the room, he verbally requested that she watch pornography with him.  Jordan did not force any physical contact.  The record does not reflect whether this encounter happened during the day or night.  Although Brittany testified that she was "on the bed" at the time of the encounter, she did not indicate that she was in a state of sleep or near sleep.  While being on a bed may indicate a state of repose, there is no indication Brittany was unaware of her surroundings or circumstances.

Admittedly, Brittany was in a state of sleep, near sleep, or repose at the time Jordan requested that she perform oral sex.  However, the remainder of the encounter was entirely dissimilar from the facts of the charged offenses.  In this instance, Jordan's approach consisted of a verbal request for oral sex, and he did not force any physical contact.

35

The uncharged incident with Caroline occurred in the kitchen. Again, the record does not reflect whether this encounter happened during the day or night and there is no evidence that Caroline was in a state of sleep, near sleep, or repose. While Jordan's use of his body to block Caroline's freedom of movement was similar to the initial circumstances of the charged offense of rape, the remainder of the encounter was entirely different. Jordan immediately initiated overwhelming physical contact when Anna attempted to move past him in the doorway. By contrast, Jordan did not attempt to overcome Caroline's resistance and no further physical contact between them occurred. The fortuity of these differing circumstances does not obviate the absence of common facts.

Based on the foregoing standards, I remain unconvinced the uncharged acts were sufficiently similar to establish modus operandi in the present appeal. Without such proof of striking similarity, "the inference that the charged act occurred is necessarily founded on nothing more than the defendant's character and predisposition as revealed by the collateral act." *Billings*, 843 S.W.2d at 892. In other words, the uncharged misconduct served to identify Jordan as the perpetrator solely on the basis of an improper inference—because he did it before, then he must have done it again. Because this highly prejudicial evidence was admitted in error over his continuing objections, Jordan should be entitled to a new trial. *See Clark*, 223 S.W.3d at 101; *Dickerson v. Commonwealth*, 174 S.W.3d 451, 469 (Ky. 2005); and *Billings*, 843 S.W.2d at 894.

36

I do not take the exclusion of evidence in child sex abuse cases lightly. Indeed, the question of whether uncharged misconduct should be admissible "confront[s] . . . courts with a difficult choice between protecting defendants against unfair prejudice and impeding the proof of charges by the prosecution." Robert G. Lawson, *The Kentucky Evidence Law Handbook* § 2.30[1][a] (2022 ed.). However, the fair and impartial administration of justice depends on our consistent interpretation of the evidentiary rules. As Justice Palmore wisely remarked, "[t]oo broad a judicial discretion tends to dilute the rule of law in favor of rule by human whim." *Puritan Homes, Inc. v. Abell*, 432 S.W.2d 632, 638 (Ky. 1968).

To resolve the inherent difficulties occasioned by this type of evidence, the United States Congress enacted FRE[6] 413 and 414 to specifically exempt uncharged sex acts from the general prohibition on propensity evidence in sexual assault and child molestation cases. *Id.* at § 2.30[5][b]. This Court has previously noted that "Kentucky has no similar rule; and KRE 404(b), as currently written excludes bad acts evidence absent an exception such as modus operandi." *Woodlee*, 306 S.W.3d at 465. Moreover, we have not explicitly adopted the federal approach, "which has been effective in federal courts since 1995." *Id.* If a majority of this Court is now convinced that propensity evidence should routinely be admitted in sex abuse cases, then I believe the proper course would be to amend our rules pursuant to KRE 1102, rather than to enlarge the scope of KRE 404(b) on an inconsistent, case-by-

_____

[6] Federal Rules of Evidence.

37

case basis. We should not construe the modus operandi exception so broadly that it swallows the rule. Therefore, I respectfully dissent.

COUNSEL FOR APPELLANT:

Emily Holt Rhorer
Assistant Public Advocate

COUNSEL FOR APPELLEE:

Daniel Cameron
Attorney General of Kentucky

Rachel Ann Wright
Assistant Attorney General