David BELL, Appellant,

v.

COMMONWEALTH of Kentucky, Appellee.

No. 92–SC–807–MR.

Supreme Court of Kentucky.

March 24, 1994.

Rehearing Denied June 23, 1994.

Mark Wettle, Louisville, for appellant.

Chris Gorman, Atty. Gen., Laura Early, Asst. Atty. Gen., Frankfort, for appellee.

STEPHENS, Chief Justice.

### REVERSING

This is a direct appeal from the judgment of the Garrard Circuit Court which sentenced appellant, David Bell, to eighty years' imprisonment following a conviction of sodomy in the first degree.

### FACTS

David A. Bell was indicted by the Garrard County Grand Jury on February 14, 1992 for the offenses of sodomy in the first degree

and assault in the second degree. The indictment alleged that the appellant forced A.C., the minor child of his live-in girlfriend, to engage in deviate sexual intercourse on or about November 1989. The assault charge, which was later amended to assault in the fourth degree, involved the hitting of A.C. by appellant with a nickel-studded belt and allegedly occurred on January 24, 1992. Appellant was acquitted of the assault charge.

The facts leading up to appellant's arrest for sodomy first came to light on December 14, 1989 when A.C. responded positively to the questioning of his mother, Sharon Cornelius, about whether anyone had ever "bothered him." A.C. replied that appellant had "played" with his penis. A.C.'s mother immediately confronted appellant. He denied the allegations. She then packed the clothes belonging to herself and A.C. and moved out of appellant's home.

On advice from her psychologist, A.C.'s mother reported the allegations to a social worker, Marsha Green, at the Department of Social Services, Cabinet for Human Resources (CHR). Ms. Green scheduled an interview with A.C. for December 20, 1989 and advised Ms. Cornelius to keep A.C. out of appellant's home. After interviewing A.C., Ms. Green recommended counseling for the child. She repeated her admonition to Ms. Cornelius to keep A.C. out of appellant's home, even cautioning the mother that her failure to protect him would result in the child being removed from her custody by the Department of Social Services and placed in foster care. The next day Ms. Green reported the abuse allegation to the Kentucky State Police, who apparently never investigated the report.

Despite the advice of the social worker, Sharon Cornelius moved A.C. back into appellant's home. While she testified that it was approximately four months later, several other witnesses including her sister, Connie Cornelius, testified that it was only ten days later.

Regrettably it was not until January, 1992, that this child was permanently removed from appellant's home, after Connie Cornelius discovered not only that appellant's abuse of A.C. was ongoing, but also that appellant had, on one occasion, allegedly abused T.C., A.C.'s older brother. At this point CHR re-entered the picture. A.C. and T.C. stayed with their aunt for nine days until they moved in with their natural father.

The evidence at trial consisted of A.C.'s testimony which described the various acts of sexual and physical abuse. Marsha Green, the original CHR social worker, testified about the first report made to CHR in December, 1989. Also through Ms. Green, the Commonwealth introduced into evidence a detailed picture drawn by A.C. during an interview with Ms. Green depicting his version of appellant ordering him to engage in sodomy, with A.C. resisting appellant's advances. The Commonwealth did not attempt to elicit from Ms. Green any conclusion she may have drawn from the picture, but rather simply that the picture was drawn by A.C. in her presence. Defense counsel did not object to the introduction of this evidence.

A.C.'s fourteen year old brother, T.C., was also called to the stand to describe for the jury two acts of sodomy allegedly perpetrated against him by appellant while on a camping trip in 1991. The trial court allowed the testimony over defense counsel's strenuous objections stated both in a pre-trial motion in limine, as well as during the trial.

Appellant's defense consisted of several witnesses, including friends, neighbors, and a former baby-sitter of the victim and his brother. All of these witnesses testified that they were frequently in the Bell home, often unannounced, and had never observed inappropriate behavior on the part of appellant toward either child. Moreover, through these witnesses defense counsel attempted to establish that, from all appearances, the rapport between appellant and the two boys was loving, normal and suggestive of a father-son type relationship. Appellant elected not to testify on his own behalf. The jury was admonished accordingly.

## ASSIGNMENTS OF ERROR

In this appeal appellant raises three issues which he claims constitute reversible error on the part of the trial court. First he alleges that error occurred with respect to

the admission into evidence of medical records from the office of Dr. Deborah Martz, a physician who examined A.C. more than two years after the alleged sexual abuse. Next, appellant complains of substantial prejudice resulting from the introduction of evidence regarding uncharged crimes alleged to have been committed by appellant against T.C., the victim's brother. These two claims of error are preserved by defense counsel's timely objections during trial. Finally, appellant contends the trial court erred by admitting into evidence a drawing made by A.C. depicting his account of appellant's sexual violence towards him. As stated before, A.C. produced the drawing during his interview with the social worker, Marsha Green, in December of 1989. This alleged error is unpreserved.

With respect to appellant's first two allegations of error this Court finds, with the utmost reluctance,[1] that we must reverse appellant's conviction and remand for a new trial. The reasons are compelling and will be discussed in detail below. As to the drawing because it is an unpreserved error, we affirm and for that reason, will not address it in this opinion.

## I. DR. MARTZ'S REPORT

Following the testimony of the Commonwealth's final witness, the trial court, over appellant's objection, admitted into evidence medical records from the office of Dr. Deborah Martz. Dr. Martz examined A.C. on January 30, 1992, more than two years after the sexual abuse alleged to have occurred in November of 1989.

Dr. Martz's report relates A.C.'s detailed description of appellant's abuse of him. She wrote, "evidently, there was penile penetration of the rectum at least twice and then a number of episodes, 18 to 20, of either oral or tactile touching of his penis." It should be noted that the number of episodes mentioned in this report is significantly higher than that contained either in the indictment or in A.C.'s actual testimony at trial. Further, the

report indicated the existence of "a small ulcer-like area about 0.1 mm" located near A.C.'s rectum, ordered testing for chlamydia and recommended therapy for the child. The primary diagnosis on the report was listed as "sexual abuse." The report also states that A.C. identified appellant as his abuser. Dr. Martz did not testify at trial.

The following portion from the trial transcript reveals the circumstances under which Dr. Martz's office records were admitted into evidence:

THE COURT: Okay. Bring us another witness, if you would?

MR. LOCKRIDGE: Your Honor, we would next move to introduce as our next exhibit a certified copy of the medical records of Doctor Deborah Marts [sic], here in Lancaster. I would like to have these marked as our next exhibit.

THE COURT: Have you seen them, Mr. Correll?

MR. CORRELL: I have seen them. I would object, Your Honor. May I approach the bench, please?

THE COURT: Yes. Come up.

BENCH DISCUSSION

THE COURT: Go ahead. Mark it for identification first. Go ahead.

MR. CORRELL: Your Honor, if he is doing this by way of a deposition being taken or a statement being taken from a doctor, *I have no way to cross examine this record.* From that standpoint, to me there hasn't even been *a foundation laid as to the creation of this record, who prepared it, where the examination came from.* Or from that standpoint—

THE COURT: Don't the new Evidence Code allow that as long as it's certified by the custodian of medical records.

MR. LOCKRIDGE: Yes. Judge, we have here a copy that's certified by the custodian of medical records.

THE COURT: Okay. There's the certification. I think the new Rules of Evidence allow it. I haven't read them all yet, but

1. It should be stated that this Court's reluctance has not to do with performing our duty, as an appellate court, to ensure that defendants are not improperly convicted. What is disheartening is

that the victim must now, because of improperly admitted evidence, endure the stress of a second trial.

that's a few of them I read. I also understand your position.

MR. CORRELL: Is there any reason why the doctor can't be here for this trial?

THE COURT: There is no reason he couldn't. Anybody could have subpoenaed him. Anybody could have taken his deposition. We are all so afraid that a doctor may have to come and sit in court all day. But, all you have to do is subpoena him and I will enforce the subpoenas. And, there is another provision—never mind.

MR. CORRELL: Objection is noted.

THE COURT: I will note your objection. It's overruled.

END OF BENCH DISCUSSION

THE COURT: You can move to introduce it, Mr. Lockridge as Commonwealth Exhibit No. 2.

MR. LOCKRIDGE: Yes, sir. Your Honor, we would move to introduce Exhibit No. 2.

THE COURT: Okay.

MR. CORRELL: Your Honor, we will move for a mistrial at this point.

THE COURT: Overruled.

(Emphasis added). As reflected by the transcript there are two basic defense objections to the admissibility of Dr. Martz's medical report. Both are valid and involve basic propositions of evidence law.

### A. *Authentication*

■ The threshold obstacle to the admissibility of this medical report is its lack of authentication. The concept of authentication (or the laying of a "foundation,") relates to a trial court's need for preliminary proof of two things: (1) the pertinence of the proposed evidence to the litigation, and (2) that a document is what its proponent claims it to be. The relevant Kentucky Rule of Evidence states:

KRE 901. Requirement of authentication or identification. (a) *General provision.* The requirement of authentication or iden-

tification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.

In this case the pertinence of Dr. Martz's medical report to the litigation is not questionable. However, without Dr. Martz's testimony, the proof obligation relating to the genuineness of the document is in no way satisfied.

It is clear that calling Dr. Martz to the witness stand would have sufficed to authenticate the medical record. Indeed, "the most widely used method of authentication is testimony by one with personal knowledge that a writing is what it is claimed to be." Lawson, *The Kentucky Evidence Law Handbook,* 3d ed., Sec. 7.05(I) (1993), KRE 901(b)(1). As the above-quoted transcript demonstrates, Dr. Martz's absence as an authenticating witness was objected to by defense counsel. Explicit in the trial judge's reply, "But all you have to do is subpoena him [sic]," is the suggestion that if defense counsel wanted to cross examine Dr. Martz, then *defense counsel* could have subpoenaed her as a witness. While theoretically a true statement, the judge's recommendation, if adopted, would improperly shift the burden of going forward with enough evidence to support a prima facie case for admissibility, to the *non-offering* party. It is most decidedly not the responsibility of defense counsel, in this case, to subpoena a witness to authenticate a document offered into evidence by the Commonwealth.[2]

The transcript also lends itself to the following observation concerning the lack of authentication of this document. The trial judge did ask the prosecutor if the medical report had been "certified," which it had. A fair inference might be drawn from that question that the trial court may have believed the document to be admissible under KRS 422.300, a statute which provides for medical records of a *hospital* to be proved by certification, without the preliminary authen-

---

**2.** This Court notes with puzzlement evidence in the record that Dr. Martz, in fact, accepted service of two subpoenas to testify on behalf of the Commonwealth. The first required her to appear on the original date of trial, June 15, 1992; the second ordered her appearance on the rescheduled trial date, July 7, 1992. Why the Commonwealth chose not to issue a subpoena for the final trial date is confusing at best.

tication contemplated by KRE 901. However, KRS 422.300 "is merely a convenient device for authenticating medical records [of a hospital]. It does not assure their admissibility or abrogate other rules of evidence relating to admission of documentary evidence." *Young v. J.B. Hunt Transp., Inc.*, Ky., 781 S.W.2d 503, 508 (1989).

While this Court does not expect trial courts to rule flawlessly on all matters coming before it during an emotionally-charged trial, this piece of crucial and damaging evidence implicates the most basic rules of authentication. The question of its admissibility required something more of the judge than the uncertainty evidenced by the transcript on this point of contention. The prosecution should have been ordered by the trial court to produce the author of this report as a witness. Only then could the trial judge have possibly ruled on whether this hearsay medical evidence, once authenticated, could survive the *second* hurdle of admissibility, a determination of whether the document contains sufficient indicia of reliability under *Drumm*.

### B. *Hearsay Medical Testimony*

■ In *Drumm v. Commonwealth*, Ky., 783 S.W.2d 380 (1990), this Court adopted FRE 803(4), now codified in Kentucky as KRE 803(4). *Id.* at 384. The rule announced in *Drumm*, also a child sexual abuse case, controls the admission of hearsay medical testimony like the doctor's report in this case. Under the law that prevailed before *Drumm*, the admissibility of hearsay medical testimony turned on whether the physician to whom an out-of-court statement was made, received the information in the capacity of a "treating" or "non-treating" (or "testifying") physician. The purpose behind the distinction can be traced to a simple idea. Where statements are made to a physician responsible for actual diagnosis and treatment of a patient, not only can the "professional objectivity" of the physician be said to be greater, but more importantly, the veracity of the declarant's statements can uniformly be thought of as more reliable. *Id.* at 384–5 (citing *Morgan v. Foretich*, 846 F.2d 941, 952 (4th Cir.1988)). The rationale is obvious.

■ In *Drumm*, this Court maintained the distinction between treating and nontreating physicians, but diminished its role in the trial court's analysis of admissibility. Rather than serving as the bright-line element which is solely determinative of admissibility, the motivation behind such declarations becomes a primary *factor* in the court's determination of reliability. *See, Hellstrom v. Commonwealth*, Ky., 825 S.W.2d 612, 615 (1992). A trial judge is to "[make] a judgment as to whether prejudicial effect outweighs ... probative value, taking into account that when such statements are not made for the purpose of treatment they have 'less inherent reliability than evidence admitted under the traditional common-law standard underlying the physician treatment rule.'" *Id.* See KRE 403.

The medical report erroneously admitted in the present case contains not simply hearsay declarations, but "hearsay upon hearsay." The statements of Dr. Martz reporting the statements A.C. made to her, are singularly subject to *Drumm*. However, from this record, it is impossible to state positively whether the medical report of Dr. Martz reflects the notes of a treating or testifying physician. The sexual abuse charged in the indictment allegedly occurred in November, 1989. A.C. was examined by Dr. Martz on January 30, 1992, one day after appellant was arrested on these charges. The timing of the examination and the over two-year gap between the charged offense and the physical examination is strong evidence that Dr. Martz's report, as it relates to sexual abuse, was prepared for the purpose of prosecuting appellant.

On the other hand, appellant was also charged with assaulting A.C. on or about January 24, 1992, only a week before the examination of the child took place. Thus, there is reason to believe that the portion of the medical report that discusses "swelling of the nose as well as bruising underneath the eyes" are the notes of a treating physician. Also, the medical report did indicate a "bump" near the victim's rectum, which lends support to the argument that Dr. Martz was a physician *treating* for sexual abuse. However the record fails to answer relevant ques-

tions such as, "How long had the bump been present?" or "Why was A.C. not examined for sexual abuse *until* the day after appellant's arrest?" The conflicting evidence of the capacity in which Dr. Martz was acting demonstrates the absolute necessity of her testimony at trial.

In short, this fact scenario provides a textbook example for application of the *Drumm* scheme of analysis: the judge must engage in an individual assessment for reliability, of any hearsay declarations contained in proposed medical testimony. "We direct the trial court to decide the hearsay question regarding *each* of the various out-of-court statements ..." *Id.* at 385. Only if Dr. Martz had been called as a witness for the prosecution could the trial court have conducted the analysis required by law.

## C. *The Right of Confrontation*

■ The error in admitting this medical report into evidence is one of constitutional magnitude which highlights the law's cardinal concern with hearsay evidence. The Sixth Amendment of the United States Constitution and Section Eleven of the Kentucky Constitution provide the accused with the right to personal confrontation with prosecution witnesses in a criminal trial. "Fundamental guarantees to the criminally accused of due process and confrontation, established by both the United States and Kentucky Constitutions are transgressed by a ... conviction based upon hearsay where no traditionally acceptable and applicable reasons for exceptions apply." *Id.* at 382.

It is historically well-established that the Confrontation Clause has two purposes:

> The primary purpose is to secure for the accused the full and unfettered right of cross-examination of the witnesses against him. The secondary purpose is to allow through the "personal appearance" of the accuser, the judge and the jury to closely observe, first hand, the "elusive and uncommunicable evidence of a witness' deportment while testifying."

*Commonwealth v. Willis,* Ky., 716 S.W.2d 224, 234 (1986) (Stephens, C.J., dissenting)

(quoting 5 Wigmore, Evidence Sec. 1395 (3d ed., Chadbourn revision, 1974)). While not precisely congruous, the Confrontation Clause and hearsay rules "stem from the same roots" and "are generally designed to protect similar values." Lawson, *supra,* Sec. 8.00, pp. 354–5 (quoting *California v. Green,* 399 U.S. 149, 155–56, 90 S.Ct. 1930, 1933–4, 26 L.Ed.2d 489, 495–96 (1970)). A violation of the rule against hearsay is not, per se, a violation of a defendant's confrontation rights. Under the present facts, however, there is no doubt that appellant was unjustifiably denied his constitutional right to confront and cross-examine the author of this damning piece of evidence.

## II. *Uncharged Crimes*

■ It was also error to admit into evidence the testimony of A.C.'s brother, T.C., that appellant had forced him to commit two acts of sodomy on one occasion in 1991. Testimony of this kind is controlled by KRE 404(b), *Other crimes, wrongs, or acts,* as well as the Kentucky case law which applies that rule. KRE 404(b) reads as follows:

> *Other crimes, wrongs, or acts.* Evidence of other crimes, wrongs, or acts is inadmissible to prove the character of a person in order to show action in conformity therewith. It may however, be admissible:
>
> (1) If offered for some other purpose, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident; or
>
> (2) If so inextricably intertwined with other evidence essential to the case that separation of the two (2) could not be accomplished without serious adverse effect on the offering party.

Our recent case, *Billings v. Commonwealth,* Ky., 843 S.W.2d 890 (1992), includes an extensive discussion of the analysis a trial court is to conduct in determining the admissibility of acts that fall into this category.

The *Billings* court recognized that while the application of KRE 404(b) has undergone a certain amount of evolution in recent years,[3] the unaltered proposition of the rule

---

**3.** *See, Russell v. Commonwealth,* Ky., 482 S.W.2d 584 (1972) (similar acts can be used to demon-

is that "evidence of criminal conduct other than that being tried, is admissible only if probative of an issue independent of character or criminal predisposition, and only if its probative value on that issue outweighs the unfair prejudice with respect to character." *Id.* at 892. Because the degree of potential prejudice associated with evidence of this nature is significantly higher, "exceptions allowing evidence of collateral criminal acts 'must be strictly construed.' " *Id.* at 893 (quoting *Pendleton v. Commonwealth*, Ky., 685 S.W.2d 549 (1985)). As a result, the thrust of KRE 404(b) has always been interpreted as *exclusionary* in nature. "It is a well-known fundamental rule that evidence that a defendant on trial had committed other offenses is never admissible unless it comes within certain exceptions, which are well-defined in the rule itself." *Jones v. Commonwealth*, 303 Ky. 666, 198 S.W.2d 969, 970 (1947). For this reason, trial courts must apply the rule cautiously, with an eye towards eliminating evidence which is relevant only as proof of an accused's propensity to commit a certain type of crime.

There are three inquiries, which together, provide a useful framework for determining the admissibility of other crimes evidence. Lawson, *supra*, at Sec. 2.25(II). Using these inquiries into relevance, probativeness, and prejudice, it is clear that the testimony of T.C. should have been excluded at trial.

#### A. *Relevance*

*Is the other crimes evidence relevant for some purpose other than to prove the criminal disposition of the accused?*

■ During the trial court's hearing on appellant's motion in limine to exclude the testimony of T.C., the prosecutor argued that this evidence was relevant to prove a common plan or scheme. The judge agreed and overruled the motion. In *Pendleton, supra* at 552, this Court recognized within the category of common plan or scheme, the admissibility of evidence tending to show a "pattern

of conduct." ´ *See also, supra*, n. 3. Since then, this Court has devised a test for determining when uncharged acts are relevant to prove a pattern of conduct. When "pattern of conduct" is the purpose for which evidence is sought to be introduced, "the real question is whether the method of the commission of the other crime or crimes is so similar and so unique as to indicate a reasonable probability that the crimes were committed by the same person." *Adcock v. Commonwealth*, Ky., 702 S.W.2d 440, 443 (1986).

Are the similarities between the uncharged crime against T.C. and the November 1989 sodomy for which appellant was tried, "so similar and so unique" as to meet the *Adcock* test? They each claim that appellant committed acts of oral sodomy against them. T.C. testified that on the one occasion involving him, appellant said, "I will *play* with you." A.C. testified that on one occasion appellant asked him "to *play* a game." On this similarity, however, the strength of what might be argued is a unique use of language by appellant (i.e., "play"), is diminished by A.C.'s testimony that no sexual activity took place that day, and that he just "figured [appellant] was trying it again." A.C. also stated that appellant had never used the terminology "play", before or since that time.

What are the dissimilarities? The uncharged conduct alleged by T.C. involves a single occasion on which two acts of oral sodomy took place. This occurred on a camping trip in Lincoln County. A.C. testified to repeated episodes of oral and anal sodomy, all of which occurred inside appellant's home. It was T.C.'s testimony that appellant used alcohol to "make him dizzy" before approaching him. A.C. testified that appellant never gave alcohol to him. The sodomy alleged by T.C. occurred in October 1991, two years after A.C. alleged abuse. A.C. testified that he was scared of appellant, because appellant told him "don't tell nobody." According to T.C., appellant did not admonish him not to tell anyone; but rather,

strate "lustful inclination"); *Pendleton v. Commonwealth*, Ky., 685 S.W.2d 549 (1985) (overruling the category of "lustful inclination" and expanding traditional "plan or scheme" to include "pattern of conduct."); *Adcock v. Commonwealth*, Ky., 702 S.W.2d 440 (1986) and *Lantrip v. Commonwealth*, Ky., 713 S.W.2d 816 (1986) (both limiting use of "pattern of conduct" to acts so similar and so unique as to serve as basis to identify perpetrator.)

told T.C. if he ever wanted to do it again, to let him know.

In sum, the trial record with regard to these separate occurrences demonstrates dissimilarity with respect to the acts, the number of acts, the time, the approach, and the place. These differences convince us that evidence of appellant's alleged crime against T.C., when compared with evidence of appellant's conduct against A.C., fail to establish the *striking* similarity that "in itself would identify appellant as the perpetrator of the acts in question." *Lantrip* at 816. In this crucial regard, this case is not like *Anastasi v. Commonwealth*, Ky., 754 S.W.2d 860 (1988), where the *details* of the uncharged conduct evidenced a striking similarity indicative of modus operandi relevant to the crime charged in the indictment. The upshot of this inquiry into relevance must weigh in favor of excluding T.C.'s testimony alleging uncharged crimes.

## B. *Probativeness*

*Is evidence of the uncharged crime sufficiently probative of its commission by the accused to warrant its introduction into evidence?*

The only evidence of the uncharged crime allegedly committed by appellant against T.C. was the testimony of T.C. and the hearsay statements of T.C. as repeated to other witnesses. There exists no independent corroborating evidence in the record that the acts T.C. alleges appellant committed did, in fact, occur.

This scarcity of evidence illustrates the inherent difficulty with this particular inquiry. Because the issue of other crimes evidence precisely involves acts that are *uncharged*, this trial is not the proper forum for substantial evidence about this allegation to come in, or be defended against. The question is whether the bare testimony of T.C., who had never come forward with allegations of sexual abuse against appellant until he learned of his little brother's abuse, is sufficiently probative of the uncharged act to warrant its introduction. To be sure, this testimony, alone, does not yield as strong a case on the "probativeness" issue as would, for example, a defendant's fingerprints on a

gun alleged to have been used in an uncharged crime.

What is clear, though, is that the inquiry into probativeness need not be a guessing game, for either lower or appellate courts. This is an issue to be determined by a trial court *before* evidence of uncharged crimes is admitted. From the record in this case, this inquiry was not even considered.

## C. *Prejudice*

*Does the potential for prejudice from the use of other crimes evidence substantially outweigh its probative value?*

Even if other crimes evidence is determined to be relevant for a proper purpose and is sufficiently probative of the defendant's guilt, it may still be excluded on this third ground. Therefore, balancing is a separate inquiry that is required to be undertaken by the trial judge. *Lawson, supra,* at Sec. 2.25(II)(D) (citing *United States v. Bridwell,* 583 F.2d 1135 (10th Cir.1978); *United States v. Figueroa,* 618 F.2d 934 (2d Cir. 1980)). A ruling based on a proper balancing of prejudice against probative value will not be disturbed unless it is determined that a trial court has abused its discretion. *Rake v. Commonwealth,* Ky., 450 S.W.2d 527 (1970).

As for the prejudice side, there exists universal agreement that evidence of this sort is inherently and highly prejudicial to a defendant. It is very difficult for jurors to sift and separate such damaging information to avoid the natural inclination to view it as evidence of a defendant's criminal disposition, especially in child sexual abuse cases. For this reason, a trial judge must consider whether a clear instruction limiting the jury's use to its *proper* purpose is likely to be effective.

In the present case, the outcome of this balancing inquiry should be clear. A majority of this Court agrees that there does not exist enough common fact of detail to establish the striking similarity between the uncharged acts and the sexual abuse for which appellant is being tried to justify admission of T.C.'s testimony as relevant to a pattern of conduct. Since there was no proper purpose this evidence could serve, the conclusion that

its potential for prejudice substantially outweighed its probative value is inescapable. *Walker v. Commonwealth*, Ky., 476 S.W.2d 630 (1972).

In this case the transcript of the trial reveals no evidence of the trial court having engaged in the analysis necessary to a proper determination of the admissibility of T.C.'s testimony under the law established by our cases. When the rulings of a trial judge are contrary to what the law requires, by way of analysis and result, and the record is lacking as to the factual and legal basis upon which the trial court exercised its discretion, this Court has an obligation not to defer to that discretion. Accordingly, we reverse on the issue of the admissibility of T.C.'s testimony at trial.

For the foregoing reasons, this Court reverses appellant's conviction and remands this case for a new trial not inconsistent with the law as stated in this opinion.

LAMBERT, LEIBSON, REYNOLDS and STUMBO, JJ., concur.

STEPHENS, C.J., dissents in a separate dissenting opinion.

WINTERSHEIMER, J., dissents in a separate dissenting opinion in which SPAIN, J., joins.

STEPHENS, Chief Justice, dissenting.

Respectfully, I must dissent on the issue raised by appellant concerning the admissibility of the victim's drawing depicting his version of appellants sexual abuse.

Although the drawing was not the subject of testimony in which the social worker testified as to her conclusions regarding the occurrence or nonoccurrence of sexual abuse, it is nevertheless inadmissible. It is beyond question that the drawing constituted an out of court statement by the victim offered for the truth of the matter asserted and for this reason should have been excluded. KRE 801(a)(1), (c). *Hellstrom v. Commonwealth*, Ky., 825 S.W.2d 612, 615 (1992).

WINTERSHEIMER, Justice, dissenting.

I respectfully dissent from the majority opinion because it was not reversible error to admit the report of the physician or the testimony of the victim's brother.

KRS 422.300 specifically permits the admission of certified hospital records in certain circumstances. *Young v. J.B. Hunt Transportation, Inc.*, 781 S.W.2d 503 (1989). The rules of evidence must be considered in this situation. The records in this case were from the office examination by the treating physician. The doctor ordinarily kept this type of record in the regular course of her professional activities, and they should be admitted as an exception provided for business records pursuant to KRE 803(6).

This report consists of two pages of laboratory results and one page which is a detailed examination record largely typewritten from the dictation of the physician and partly in the handwriting of the physician. It contains a history of the alleged sex abuse, including an accusation that Bell was slapping the mother of the child, comments with respect to the socialization of the child, findings on medical examinations, including a small ulcer on the rectum of the child, and concludes with a diagnosis of sexual abuse and a recommendation for counseling. I believe that the admission of this testimony came within the purview of the exceptions to the hearsay rule announced in *Drumm v. Commonwealth*, Ky., 783 S.W.2d 380 (1990) because the medical report was made for the purpose of medical diagnosis and treatment.

The testimony by the brother of the victim was properly admitted because it showed intent, motive or common plan or method of operation. *Anastasi v. Commonwealth*, 754 S.W.2d 860 (1988). The common characteristics here were that both victims were brothers and considered Bell as a father when they were forced to submit to the oral sodomy. It is always a difficult decision to admit such evidence, but I believe that discretion must be left in the hands of the trial judge. The requirement for showing a common plan or indicating a method of operation can be met in a child sex abuse case because the principal similarity is that the victims are all children and are either required to perform or submit to sexual acts. The fact that the crimes are all sex crimes and the victims

are all children makes this kind of situation so strikingly similar as to be a signature event and so unique as to meet the standard of demonstrating a common plan or method of operation.

I would affirm the judgment of conviction in all respects.

SPAIN, J., joins in this dissent.