# IMPORTANT NOTICE

## "NOT TO BE PUBLISHED OPINION"

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED" PURSUANT TO RULE OF APPELLATE PROCEDURE (RAP) 40(D). THIS OPINION SHALL NOT BE CITED AS BINDING PRECEDENT IN ANY OTHER CASE IN ANY COURT OF THIS STATE.

UNDER RAP 41, UNPUBLISHED OPINIONS OF KENTUCKY APPELLATE COURTS RENDERED AFTER JANUARY 1, 2003, THAT ARE FINAL UNDER RAP 40(G), MAY BE CITED BY A PARTY FOR CONSIDERATION BY A COURT IF THERE IS NO PUBLISHED OPINION THAT ADEQUATELY ADDRESSES THE POINT OF LAW BEING ARGUED BY A PARTY.

IF AN UNPUBLISHED OPINION IS CITED FOR CONSIDERATION BY A COURT THE OPINION SHALL BE SET OUT AS AN UNPUBLISHED OPINION IN THE DOCUMENT IN WHICH THE UNPUBLISHED OPINION IS CITED.

RENDERED: JUNE 25, 2026
NOT TO BE PUBLISHED

# Supreme Court of Kentucky

2025-SC-0092-MR

LORENZO TUNSTULL                                           APPELLANT

V.

ON APPEAL FROM JEFFERSON CIRCUIT COURT
HONORABLE JESSICA E. GREEN, JUDGE
NO. 22-CR-001019

COMMONWEALTH OF KENTUCKY                           APPELLEE

## MEMORANDUM OPINION OF THE COURT

## AFFIRMING

Lorenzo Tunstull was convicted following a jury trial in Jefferson Circuit Court of murder, being a convicted felon in possession of a handgun, and two counts of wanton endangerment in the first degree. He was sentenced to fifty years' imprisonment and now appeals to this Court as a matter of right.[1] We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

On the morning of March 18, 2022, Ricky Harris left his home with his girlfriend, Kiara Clayton, and their two children. After dropping the oldest child off at his elementary school, the remaining trio stopped for breakfast before going to a local Wal-Mart. Shortly after they entered the parking lot, a

---

[1] KY. CONST. § 110(2)(b).

gold Toyota Avalon with tinted windows pulled in and parked nearby. It remained there for approximately thirty to thirty-five minutes and the occupants did not exit. After completing their shopping, Ricky, Kiara, and the child got into their vehicle and headed for home. The Avalon exited the parking lot and followed behind them.

The events that unfolded as the family returned home were captured by their Ring doorbell camera. Ricky exited the car and headed toward the home with his son following behind. Kiara paused when she saw the Avalon pull up. Neither she nor Ricky recognized the car or its occupants. Shortly thereafter, a man dressed in black exited the Avalon, walked approximately six feet into the yard, and unleashed a hail of gunfire. At least one bullet struck the family car where Kiara was taking cover, and another hit the cellphone she was holding. While both she and the minor child was unharmed, Ricky was mortally wounded and died on his front porch from multiple gunshot wounds.

During the ensuing investigation, police discovered surveillance video of the Avalon in the parking lot of a local community center. The video revealed a woman and two men exiting the vehicle. One of the men was dressed in black clothing. The men walked sufficiently close to the camera for officers to see their faces in detail. Officers were able to identify the man wearing black as Tunstull.

Police located and arrested Tunstull on April 22, 2022, charging him with murder, three counts of trafficking in a controlled substance, two counts of possession of a handgun by a convicted felon, and two counts of wanton

2

endangerment in the first degree. During his arrest, police located and seized a cellphone and a Glock pistol from Tunstull's person. During a subsequent custodial interview, Tunstull made incriminating statements which he later moved to suppress. Following a hearing, the trial court denied his motion.

Prior to trial, the drug trafficking charges and one of the handgun possession charges were severed and the Commonwealth amended the murder count to include a complicity theory. Following a five-day trial, Tunstull was convicted on all remaining counts and was sentenced to fifty years' imprisonment in accordance with the jury's recommendation. This appeal followed.

## ANALYSIS

Tunstull raises three allegations of error in seeking reversal. First, he contends statements he made during a custodial interview were obtained in violation of his *Miranda*[2] rights and should therefore have been suppressed. Second, he alleges testimony from a Louisville Metro Police Department (LMPD) intelligence analyst who assisted in the investigation was unduly prejudicial and should not have been permitted. Finally, Tunstull raises multiple challenges to various portions of testimony adduced from the lead investigator, LMPD Detective Chris Rutherford.

---

[2] *Miranda v. Arizona,* 384 U.S. 436 (1966).

## A.  No *Miranda* Violation Occurred.

Tunstull first alleges suppression of his statements made during a custodial interview was warranted because they were obtained after he invoked his rights under *Miranda*.  He asserts he unequivocally asserted his right to remain silent and Detective Rutherford's continuing questioning was improper.  Therefore, he argues his statements were inadmissible and the trial court erred in concluding otherwise.  We disagree.

Tunstull's custodial interview with Detective Rutherford was recorded in full and presented as evidence at the suppression hearing.  The recording reveals that near the beginning of his interview, Tunstull was read his *Miranda* rights directly from a Rights Waiver Form.  Detective Rutherford then further explained the rights and explicitly advised Tunstull he had the right to an attorney and could stop the questioning at any point in time by refusing to answer or requesting an attorney, stating "if at any time you get uncomfortable, we can stop."  Tunstull acknowledged he understood his rights.  Detective Rutherford then asked if he would be willing to talk about the gun that police had located on his person when he was arrested, and the following exchange took place:

TUNSTULL:  There ain't nothing to talk about.

DET. RUTHERFORD:  Why's that?

TUNSTULL:  What's there to talk about?[3]

---

[3] Although Tunstull asserts he repeated "there ain't nothing to talk about" after Detective Rutherford's question, our review of the recording of his interview does not bear out this contention.  Admittedly, the audio quality from the recording of the suppression hearing when the interview was played is less than desirable.  However,

4

> DET. RUTHERFORD: Well, we try to track where these guns came from and all that stuff.
>
> TUNSTULL: I don't know. I found it in the car I was going through.
>
> DET. RUTHERFORD: That being said, before I can talk to you about that, I gotta, I gotta know that you're okay to talk to me, okay?
>
> TUNSTULL: Yeah.
>
> DET. RUTHERFORD: Okay.

Detective Rutherford then repeated Tunstull's rights to him. After Tunstull again indicated he understood, Detective Rutherford asked, "You want to talk to me?" The interview continued and Tunstull began speaking about where and how he obtained the gun. He spoke with Detective Rutherford for approximately an hour and a half.

Prior to trial, Tunstull moved to suppress all statements made during the interview, alleging they were obtained in violation of *Miranda*. After convening an evidentiary hearing, reviewing the arguments and briefs of counsel, and independently considering Tunstull's statements, the trial court concluded he had not unequivocally invoked his right to remain silent and to terminate further questioning. In so doing, the trial court indicated it had considered the context in which Tunstull's purported invocation was made to determine what a reasonable police officer in that circumstance would reasonably understand

---

the original recording of the interview included separately in the record has substantially higher audio quality, making Tunstull's statement readily understandable.

the statement to mean. It found Detective Rutherford was reasonable to not have believed Tunstull's statement to mean he wished to cease the interview. Therefore, the trial court held suppression was unwarranted and Tunstull's motion was denied.

Before this Court, Tunstull claims his statement, "there ain't nothing to talk about," was the functional equivalent of an assertion of his right to remain silent under *Miranda*. He alleges his invocation of this right required Detective Rutherford to immediately cease the interrogation and to "scrupulously honor" his right to cut off questioning. Thus, he contends the trial court erred in denying his suppression motion.

This Court utilizes a two-step process when reviewing rulings on motions to suppress.

> First, we review the trial court's findings of fact under the clearly erroneous standard. Under this standard, the trial court's findings of fact will be conclusive if they are supported by substantial evidence. Second, we review de novo the trial court's application of the law to the facts.

*Rhoton v. Commonwealth*, 610 S.W.3d 273, 275-76 (Ky. 2020). Substantial evidence has been defined as "evidence of substance and relevant consequence having the fitness to induce conviction in the minds of reasonable men." *Commonwealth v. Jennings*, 490 S.W.3d 339, 346 (Ky. 2016) (quoting *Owens-Corning Fiberglas Corp. v. Golightly*, 976 S.W.2d 409, 414 (Ky. 1998)). We are careful "to give due weight to inferences drawn from those facts by resident judges and local law enforcement officers." *Ornelas v. United States*, 517 U.S. 690, 699 (1996). A trial court's ruling on a suppression motion is "based

6

squarely [on] the evidence presented at the suppression hearing." *Hampton v. Commonwealth*, 231 S.W.3d 740, 749 (Ky. 2007).  As a reviewing Court, we will not substitute our view of the evidence for that of the trial court.  *Payne v. Commonwealth*, 681 S.W.3d 1, 4 (Ky. 2023).

> "The Fifth Amendment of the United States Constitution provides that no person 'shall be compelled in any criminal case to be a witness against himself.'" [*Colorado v. Spring*, 479 U.S. 564, 572 (1987)].  Before a custodial interrogation commences, a defendant must be informed "that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has the right to the presence of an attorney, either retained or appointed." *Miranda*, 384 U.S. at 444, 86 S.Ct. 1602.  If the defendant desires not to talk with police, begins speaking and subsequently decides to stop the questioning, or requests an attorney's presence, the interrogation must cease. *Id.* at 445, 86 S.Ct. 1602.  Any waiver of the right to remain silent must be made "voluntarily, knowingly, and intelligently." *Id.* at 444.  The Commonwealth bears the burden of "affirmatively establish[ing] the voluntariness of a confession by a preponderance of the evidence." *Tabor v. Commonwealth*, 613 S.W.2d 133, 135 (Ky. 1981).

*Hernandez v. Commonwealth*, 730 S.W.3d 923, 931 (Ky. 2026).

The law "require[s] an accused who wants to invoke his or her right to remain silent to do so unambiguously." *Berghuis v. Thompkins*, 560 U.S. 370, 381 (2010).  An unambiguous and unequivocal invocation of the right to remain silent does not require any "special combination of words." *Quinn v. United States*, 349 U.S. 155, 162 (1955).  "[A] suspect need not speak with the discrimination of an Oxford don." *Davis v. United States*, 512 U.S. 452, 459 (1994) (citation and internal quotation marks omitted).  Indeed, "no ritualistic formula or talismanic phrase is essential in order to invoke the privilege against self-incrimination.  All that is necessary is an objection stated in

7

language that [an interrogator] may reasonably be expected to understand as an attempt to invoke the privilege." *Emspak v. United States*, 349 U.S. 190, 194 (1955). Additionally, "[o]nce an individual being questioned has asserted [his or] her right to remain silent, the police must end the interrogation." *Buster v. Commonwealth,* 364 S.W.3d 157, 163 (Ky. 2012).

Tunstull does not challenge that Detective Rutherford informed him on multiple occasions of his constitutional rights, both prior to and during his interview. Nor does he posit that he did not understand those rights. Rather, his challenge is based solely on his contention he effectively invoked his right to cease the detective's questioning by saying "there ain't nothing to talk about," and his will was not honored. Our review of the record reveals the trial court correctly determined there was no unequivocal invocation by Tunstull of his right to remain silent.

Tunstull's remark that there was nothing to talk about was a statement that the gun found on his person when he was arrested spoke for itself, leaving nothing upon which to elaborate. Contrary to Tunstull's assertion, his statement is not the same as a defendant saying, "I don't have anything to say." Indeed, based on our review of the record and the totality of the circumstances, it is clear Tunstull did not "articulate his desire to [remain silent] sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request" to stop the questioning. *Davis*, 512 U.S. at 459. Thus, we conclude Detective Rutherford could not reasonably be expected to discern that Tunstull was asserting his right to remain silent. Furthermore,

8

absent a clear assertion of a constitutional right, it cannot be said the officer did not scrupulously honor Tunstull's wishes nor that the resulting interview resulted from any coercive forces. "[F]ull comprehension of the rights to remain silent and request an attorney [is] sufficient to dispel whatever coercion is inherent in the interrogation process." *Id.* at 460 (quoting *Moran v. Burbine*, 475 U.S. 412, 427 (1986)). Tunstull was adequately informed of his rights, unequivocally affirmed his understanding thereof, and although given multiple opportunities to do so did not expressly invoke his rights. No *Miranda* violation occurred, suppression was unwarranted, and the trial court did not err.

**B. LMPD Intelligence Analyst's Testimony Not Unduly Prejudicial.**

Tunstull next asserts the Commonwealth was permitted to introduce both unduly prejudicial and improper opinion testimony from one of its witnesses. We review a preserved allegation of nonconstitutional evidentiary error for abuse of discretion. *Mason v. Commonwealth*, 559 S.W.3d 337, 339 (Ky. 2018). The test for an abuse of discretion "is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by substantial evidence." *Goodyear Tire & Rubber Co. v. Thompson*, 11 S.W.3d 575, 581 (Ky. 2000) (citing *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999)). Tunstull concedes his allegation regarding improper opinion testimony is unpreserved and requests palpable error review under RCr[4] 10.26. In reviewing for palpable error, this Court will only reverse the judgment if "the

---

[4] Kentucky Rules of Criminal Procedure.

9

error is so manifest, fundamental and unambiguous that it threatens the integrity of the judicial process." *Johnson v. Commonwealth*, 676 S.W.3d 405, 417 (Ky. 2023) (quoting *Martin v. Commonwealth*, 207 S.W.3d 1, 5 (Ky. 2006)). "It should be so egregious that it jumps off the page . . . and cries out for relief." *Id.* (quoting *Chavies v. Commonwealth*, 374 S.W.3d 313, 323 (Ky. 2012)).

During the investigation, Detective Rutherford was assisted by Caitlin Mattingly, an LMPD intelligence analyst. Mattingly was tasked with identifying three men in a picture provided to her by Detective Rutherford. At trial, she testified that she was able to identify all three, one of whom was a man named Bryan Smith who looked similar to the victim. Mattingly also stated she learned that Smith had previously resided at the home where Ricky and Kiara lived and were shot. When asked by the Commonwealth whether Smith was associated with any particular group, affiliation, or organization, the defense objected.

At the following bench conference, the trial court first ruled that no evidence of Tunstull's alleged gang affiliation could be presented. However, it concluded proof that a known gang member previously lived at the address where the murder occurred was relevant and probative to the Commonwealth's theory of the case that the shooting stemmed from a case of mistaken identity. Further discerning that no prejudice to Tunstull would ensue, the trial court held the evidence would be admissible to show a potential motive and overruled the defense objection. The Commonwealth then elicited testimony from Mattingly about Smith's gang affiliation.

10

# 1. Bad Acts Evidence.

Tunstull now asserts the trial court failed to adequately support its decision to admit evidence of other bad acts under KRE[5] 404(b). Additionally, Tunstull claims the Commonwealth failed to give notice of its intent to introduce evidence of Smith's gang affiliation in contravention of KRE 404(c).

The general rule is well-established "that evidence of other crimes is not admissible to show that a defendant is a person of criminal disposition." *Gasaway v. Commonwealth*, 671 S.W.3d 298, 333 (Ky. 2023) (citing KRE 404(a)). However, such evidence may be admissible when offered for a purpose other than criminal predisposition "such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident; or . . . [i]f so inextricably intertwined with other evidence essential to the case that separation of the two (2) could not be accomplished without serious adverse effect on the offering party." KRE 404(b)(1)-(2).

> "Trial courts must admit evidence under KRE 404(b) 'cautiously, with an eye towards eliminating evidence which is relevant only as proof of an accused's propensity to commit a certain type of crime.'" *Riggle v. Commonwealth*, 686 S.W.3d 105, 112 (Ky. 2023) (quoting *Bell v. Commonwealth*, 875 S.W.2d 882, 889 (Ky. 1994)). In determining admission under KRE 404(b), "the trial court must consider whether the evidence is relevant, probative of the prior bad act, and whether its potential prejudice substantially outweighs any probative value." *Id.* Additionally, in criminal cases, KRE 404(c) requires that "if the prosecution intends to introduce evidence pursuant to subdivision (b) of this rule as a part of its case in chief, it shall give reasonable pretrial notice to the defendant of its intention to offer such evidence."

---

[5] Kentucky Rules of Evidence.

11

*Hernandez Mendez v. Commonwealth*, ___ S.W.3d ___, No. 2024-SC-0501-MR, 2025 WL 3768168, at *6 (Ky. Dec. 18, 2025).

"KRE 404(b) and (c) apply not only to other bad acts of the defendant, but also to persons other than the defendant." *Smith v. Commonwealth*, 636 S.W.3d 421, 436 (Ky. 2021) (citing *Parker v. Commonwealth*, 241 S.W.3d 805, 812 (Ky. 2007)). When applying 404(b) to someone other than the defendant, courts look at the first two prongs of the three-pronged test relative "to the person who committed the other bad act and not to the defendant." *Id.* "When the rulings of the trial judge are contrary to what the law requires, by way of analysis and result, and the record is lacking as to the factual and legal basis upon which the trial court exercised its discretion, this Court has an obligation not to defer to that discretion." *Bell*, 875 S.W.2d at 891.

Tunstull does not dispute that Smith's gang membership was relevant and probative to the potential motive for the shooting, nor does he challenge the trial court's decision relative to these two prongs of the test. Rather, he contends testimony about Smith being in a gang resulted in undue prejudice because, upon hearing that information, the jury would have automatically assumed Tunstull himself was a gang member. However, apart from a single conclusory sentence based on his own assumptions, Tunstull offers nothing of substance to support his claim. It is not the function of this Court to construct legal arguments on behalf of an appellant, nor to scour the record to find support for or flesh out underdeveloped arguments, and we will not do so. *Harris v. Commonwealth*, 384 S.W.3d 117, 131 (Ky. 2012). Nevertheless, upon

12

our review of the record, a sufficient basis exists to conclude the trial court appropriately supported its decision relative to application of KRE 404(b), and we discern no abuse of discretion in its ruling.

Equally unavailing is Tunstull's assertion that the Commonwealth failed to give any notice as mandated by KRE 404(c) of its intent to introduce evidence of Smith's gang membership. Under the rule, the Commonwealth is required to "give reasonable pretrial notice to the defendant of its intention to offer" other bad acts evidence. The purpose of the notice requirement is to permit the defendant to file a motion *in limine* challenging the admission of the proposed evidence and "to deal with reliability and prejudice problems at trial." *Matthews v. Commonwealth,* 163 S.W.3d 11, 19 (Ky. 2005) (internal quotation marks and citation omitted).

In this matter, during the bench conference, the Commonwealth informed the trial court it had provided notice the week prior to trial immediately upon determining Smith's affiliation and the possible connection to a motive. While close in time to the start of trial, the Commonwealth disclosed the evidence at the earliest feasible time upon learning of its existence and potential significance. Further, in discovery, the defense had been provided with Smith's name and photograph, and was made aware the Commonwealth possessed the contents of Tunstull's phone which included conversations between Tunstull and his cousin in which photographs of Smith and details of the location of the shooting were exchanged. Contrary to Tunstull's assertion, the record reflects that the notice was not provided for the

13

first time during trial, and we disagree with Tunstull that he had no opportunity to challenge the evidence via a motion *in limine*. For reasons unknown, he did not do so. But such a failure does not mean Tunstull did not receive actual notice the evidence would be presented. He was not deprived of the opportunity to argue against admission of the evidence. The Commonwealth's notice was reasonable under the circumstances of this case and the trial court did not abuse its discretion in permitting the testimony.

## 2. Opinion Testimony.

Tunstull also contends it was palpable error for Mattingly to testify as to her opinion that Ricky and Smith had similar appearances. He asserts she was not qualified as an expert in comparing photographs of black men, she is not black, and "testimony on cross-racial identifications is more unreliable than is testimony on same-race identifications." *Commonwealth v. Christie*, 98 S.W.3d 485, 490 (Ky. 2002). Further, Tunstull claims her lay opinion was elicited only to prop up the Commonwealth's theory of the case and offered nothing to assist the jury to determine a fact in issue. Thus, he asserts reversal is warranted. We disagree.

Before being asked about the photographs, Mattingly informed the jury about the specifics of her job as an intelligence analyst which included, among other duties, reviewing recorded camera footage, monitoring live cameras, and accessing various data sources including ankle-monitoring location tracking systems and "thousands" of cameras placed around Louisville. Based on her training and experience, she testified Ricky and Smith looked similar and she

14

believed they had similar features. Tunstull did not object to this testimony, but vigorously challenged Mattingly's statements and credibility on cross-examination. While she admitted she had no personal knowledge of either man, Mattingly informed the jury she based her comparison not just on skin color but on facial hair, stature, and other things of similar nature.

The jury was free to accept or reject Mattingly's testimony and to judge her credibility. Tunstull was not prohibited from commenting on the evidence, challenging her credibility, or urging the jury to adopt his interpretation of the facts and reject that of the Commonwealth. Indeed, through his cross-examination—which is the primary mechanism by which the jury is able to assess a witness's reliability, bias, and motivation—Tunstull attempted to cast doubt on Mattingly's rationale. The mere fact that the jury did not accept Tunstull's defense does not indicate the trial court palpably erred in allowing Mattingly's brief comparison testimony. No manifest injustice occurred and Tunstull has not shown a "probability of a different result or error so fundamental as to threaten [his] entitlement to due process of law." *Martin*, 207 S.W.3d at 3.

### C. No Palpable Error in Detective Rutherford's Testimony.

For his final allegation of error, Tunstull launches a multi-part attack on Detective Rutherford's testimony, claiming it "was riddled with errors." No contemporaneous objection was lodged relative to any of the statements he now challenges. As such, his arguments are unpreserved and will be reviewed only for palpable error. We will address each in turn.

15

# 1. Tunstull's Gang Affiliation.

During Detective Rutherford's testimony, the Commonwealth played portions of his interview of Tunstull. The recording of the original interview was edited to remove sections containing discussions unrelated to the current charges. The parties agreed to the parts which were to be removed. Tunstull now contends a short exchange was played which contravened the trial court's previous ruling that no evidence of Tunstull's gang affiliation would be permitted. In that exchange, Detective Rutherford was talking about Tunstull's prior statement that his life had been in danger and asked if that was because "people associate you like, with the Park Hill Clique, right?" Tunstull responded affirmatively. The Commonwealth made no further reference to the statements. However, on cross-examination, the following interaction occurred:

> DEFENSE: As part of your research, did you determine a connection between Bryan Smith and Mr. Tunstull? Did you determine whether Bryan Smith and Mr. Tunstull had ever met or knew each other?
>
> DET. RUTHERFORD: I would say they're both a part of factions that do not get along with each other.
>
> DEFENSE: That's fair to say.

Tunstull contends Detective Rutherford's answer was non-responsive and should have been stricken. Taken together with the portion of the interview seen by the jury, he asserts palpable error occurred and reversal is mandated.

Initially, Tunstull fails to explain how the Commonwealth's playing of an agreed-upon, edited version of his police interview could rise to the level of

16

palpable error. While he takes issue with the Commonwealth's assurances it would attempt to trim down a portion of the interview to be played following an overnight recess, those statements were directed to the trial court and concerns for moving the trial along more quickly as the end of the week approached. Nowhere was there mention of removing the particular passage at issue, nor does Tunstull indicate how removal of the statement would have led to a different result nor how its inclusion threatened his entitlement to due process. *Id.*

Further, Detective Rutherford's allegedly non-responsive answer which Tunstull contends permitted the jury to infer he was in a gang likewise does not constitute palpable error. Indeed, to the extent it was error at all, it was invited. Not only did Tunstull fail to object to Detective Rutherford's answer to his own question, he specifically agreed the response was "fair." "Generally, a party is estopped from asserting an invited error on appeal." *Quisenberry v. Commonwealth*, 336 S.W.3d 19, 37 (Ky. 2011). Otherwise, a party would be permitted "to take advantage of an error produced by his own act." *Wright v. Jackson*, 329 S.W.2d 560, 562 (Ky. 1959); *United States v. Myers*, 854 F.3d 341, 355 (6th Cir. 2017) ("Challenges to such invited errors are forfeited."). "[I]nvited errors that amount to a waiver, *i.e.,* invitations that reflect the party's knowing relinquishment of a right, are not subject to appellate review." *Quisenberry*, 336 S.W.3d at 38. Tunstull cannot intentionally elicit testimony from a witness and then assert on appeal that the testimony mandates reversal of his conviction and a new trial.

17

## 2. Bolstering of Mattingly.

Tunstull next asserts Detective Rutherford improperly vouched for and bolstered Mattingly's testimony. When discussing his collaboration with Mattingly during the investigation, Detective Rutherford stated:

> Sure. She's, like she said, an intelligence analyst and she's amazing. If I ever need to know who somebody is, like she's the first person I go to. You ask her to do something and she's going to go above and beyond what you ask her to do.

Tunstull argues the explanation of Mattingly's job performance was unhelpful to the jury and served only to enhance her credibility and bolster the Commonwealth's theory of the case. Apart from this single statement, he offers no analysis or support for his position. As previously stated, it is not our role to construct or support underdeveloped arguments for a party, *Harris*, 384 S.W.3d at 131, and this is especially true when our review is for palpable error. We decline to do so in this instance.

## 3. Tunstull's Veracity.

During cross-examination, Detective Rutherford made remarks during three exchanges which Tunstull asserts should have been stricken as being improper comments on his truthfulness. Detective Rutherford once indicated Tunstull was "dishonest about several things," commented "I mean, there's honesty and dishonesty," and used a variation of the word "lie" twice. As with his previous argument, Tunstull offers little more than a conclusory statement in support of his position.

He is correct that, generally, a witness is prohibited from opining about the truthfulness of another witness or the defendant as that determination

18

rests solely within the province of the jury. *Barrett v. Commonwealth*, 677 S.W.3d 326, 340 (Ky. 2023) (citing *Moss v. Commonwealth*, 949 S.W.2d 579 (Ky. 1997)). However, Tunstull fails to acknowledge that the cherry-picked responses he now challenges were responsive to explicit questions from his own counsel, so any error was invited. Indeed, in two instances, counsel specifically asked Detective Rutherford if Tunstull had been truthful when answering certain questions during his interview. The receipt of unfavorable responses to such prompts cannot serve as the basis for a finding of palpable error. *Holbrook v. Commonwealth*, 525 S.W.3d 73, 84 n.6 (Ky. 2017).

### 4. Tunstull's Refusal to Testify.

Shortly after his cross-examination began, the following exchange occurred regarding the driver of the car on the day of the shooting:

> DEFENSE: She could confirm who was in the car and who was shooting, right?

> DET. RUTHERFORD: I think Mr. Tunstull could as well.

Tunstull now asserts that because he did not take the stand, Detective Rutherford's response was transformed into a "clear insinuation" that the detective believed "Tunstull knew who the shooter was because *he* was the shooter." He claims this statement constituted an improper comment on his invocation of a constitutional right and invaded the province of the jury. Once again, Tunstull offers nothing more than a conclusory statement to support his position.

"Not every comment that refers or alludes to a nontestifying defendant is an impermissible comment on his failure to testify, and not every comment

19

upon silence is reversible error." *Ragland v. Commonwealth,* 191 S.W.3d 569, 589 (Ky. 2006) (citations and internal quotation marks omitted). A reversible violation occurs "only when it was manifestly intended to be, or was of such character that the jury would necessarily take it to be, a comment upon the defendant's failure to testify . . . or invited the jury to draw an adverse inference of guilt from that failure." *Id.* at 589-90. We cannot say that Detective Rutherford's passing statement in the face of a blistering cross-examination was of such a character as to draw negative attention to the invocation of Tunstull's right not to testify, especially when the Commonwealth had not yet closed its case-in-chief and it was unknown whether Tunstull would, in fact, testify in his own defense. There certainly was no palpable error.

### 5. Speculation.

Finally, Tunstull claims Detective Rutherford's testimony was "rampant with speculation" and he testified to areas outside his expertise. In particular, he challenges testimony relative to cell phone call logs, geographic coordinates, messages and cell phone usage, and the absence of DNA evidence. Tunstull cites no authority apart from passing reference to two evidentiary rules, and aside from recounting the testimony, offers only conclusory statements that Detective Rutherford's testimony was prejudicial and likely misled the jury. His assertions are without merit.

The challenged statements were properly admitted as they referred to Detective Rutherford's involvement in the investigation and his personal

20

knowledge relative to the matters being testified about. KRE 602. Detective Rutherford did not invade the province of an expert in any of his testimony. As is the case with all others, the jury was free to accept or reject his statements and to judge his credibility. Tunstull has failed to make any showing the testimony was erroneous, much less palpably so.

**CONCLUSION**

For the foregoing reasons, the judgment and sentence of the Jefferson Circuit Court is affirmed.

All sitting. Lambert, C.J.; Bisig, Conley, Goodwine, Keller, and Nickell, JJ., concur. Thompson, J., concurs in result only by separate opinion.

THOMPSON, J., CONCURRING IN RESULT ONLY: I join the Court's judgment affirming Lorenzo Tunstull's convictions, as the Commonwealth introduced compelling evidence of guilt, including video footage of the Toyota Avalon following the victim and doorbell camera footage capturing Tunstull exiting the vehicle and firing his weapon. This evidence, standing alone, establishes his identity as the shooter and supports the jury's verdict beyond a reasonable doubt.

I write separately, however, to address the admission of testimony concerning alleged gang affiliations and practices. In my view, the gang-related evidence admitted at trial was largely irrelevant to the charged offenses and posed a significant danger of unfair prejudice. Introducing evidence of gang membership and activity risks derailing an otherwise fair trial by injecting speculation, innuendo, and emotion that distract from the actual crime. Jurors

21

may place disproportionate weight on such evidence, encouraging conviction based not on proof, but on perceived character or association.

These risks are well established. Gang membership, standing alone, rarely sheds light on whether a defendant committed a particular act. When the evidence instead consists of activities of other individuals, at other times, for unrelated reasons, its probative value diminishes further while its prejudicial force intensifies. A conviction based on this type of evidence would undermine the fundamental fairness of a trial and violate the Fourteenth Amendment. *Payne v. Tennessee*, 501 U.S. 808, 825 (1991) (*see Andrew v. White*, 604 U.S. 86, 92–95 (2025), which clarified *Payne* is clearly established federal law).

The leading U.S. Supreme Court case is *Dawson v. Delaware*, 503 U.S. 159 (1992). The Court analyzed evidence of the defendant's membership in the Aryan Brotherhood gang for relevance in a capital sentencing proceeding and found "constitutional error" in admitting the gang evidence because gang membership was not relevant to the underlying murder, an aggravating circumstance, or mitigating evidence. *Id.* at 165-168. The irrelevant nature of the evidence left the Court "with the feeling that the Aryan Brotherhood evidence was employed simply because the jury would find these beliefs morally reprehensible." *Id.* at 167. *See Cunningham v. Commonwealth*, 501 S.W.3d 414, 422 (Ky. 2016) ("[A] trial court has absolutely no discretion to admit irrelevant evidence.").

22

Admitting gang membership or gang practice evidence unconnected to the charged crime can render a trial fundamentally unfair and violate federal due process. *People v. Albarran*, 149 Cal. App. 4th 214 (2007), provides a clear framework for identifying when such evidence crosses the constitutional line, holding it inadmissible when it lacks a permissible non-propensity purpose and carries an inherently inflammatory risk. The court found a due process violation where the gang evidence—such as threats to police or references to prison gangs—was irrelevant to motive or intent and so inflammatory that it offered "no permissible inferences" to the jury and undermined trial fairness. *Id.* at 229.

Kentucky has applied a similar analysis and created a significant threshold for admitting gang evidence. In *Hudson v. Commonwealth*, 385 S.W.3d 411, 419 (Ky. 2012), we upheld the introduction of gang evidence after applying Kentucky Rules of Evidence (KRE) 401 and 403 because the "evidence of gang activity and gang affiliation presented at trial was not excessive and was highly probative of motive and intent." Additionally, gang evidence not related to the charged offense would violate KRE 404 as improper character evidence or evidence of other crimes. As the U.S. Supreme Court has warned, when evidence invites the jury to condemn a defendant because he is a "bad person," rather than because he committed the charged offense, the danger of unfair conviction is acute. *Old Chief v. United States*, 519 U.S. 172, 181 (1997).

Consistent with these principles, the gang evidence admitted at Tunstull's trial lacked the necessary nexus to the offenses. While the

23

Commonwealth may present a coherent narrative, the scope of the gang-related evidence here exceeded what was necessary to explain the events and created a risk that the jury would view the defendant as an extension of a criminal organization rather than as an individual charged with a discrete act. But given the strength of the independent evidence of guilt—particularly the video recordings—the error was ultimately harmless beyond a reasonable doubt. *See, e.g., Winstead v. Commonwealth*, 283 S.W.3d 678, 688–89 (Ky. 2009).

Going forward, I emphasize that courts must scrutinize gang evidence with care. Unrelated gang activity has an outsized and distorting effect on the truth finding process. Once the label "gang" is invoked, the threat of conviction by association becomes real, and the presumption of innocence is put at risk. To maintain the integrity of trials in the Commonwealth, trial courts should admit such evidence sparingly and only where its relevance is concrete and its necessity clear.

COUNSEL FOR APPELLANT:

Travis Bewley
Kathleen Kallaher Schmidt
Assistant Public Advocates

COUNSEL FOR APPELLEE:

Russell M. Coleman
Attorney General of Kentucky

Graham Pilotte
Assistant Solicitor General